CONSOLIDATED FREIGHTWAYS, INC. & AFFILIATES, PETITIONER
*v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 8066–76.    Filed July 22, 1980.

*James E. Merritt,* for the petitioner.
*Bryce A. Kranzthor,* for the respondent.

STERRETT, *Judge:* By letter dated June 2, 1976, respondent determined deficiencies in income taxes due from petitioner[1] for the following taxable years and amounts:

---

[1]At all times relevant hereto, petitioner Consolidated Freightways, Inc., was the common parent of an affiliated group which included the following corporations:

| Affiliated corporation | Taxable years |
|---|---|
| Aetna Freight Lines, Inc. | 1969–70, incl. |
| Alaska Consolidated Freightways Corp | 1966–68, incl. |
| CF Air Freight, Inc | 1966–70, incl. |

| TYE Dec. 31— | Deficiency |
|---|---|
| 1966 | $84,395 |
| 1967 | 152,664 |
| 1968 | 181,428 |
| 1969 | 493,076 |
| 1970 | 41,661 |
| Total | 953,224 |

After concessions, the primary issues for our decision are (1) whether petitioner's investments in certain truck docks qualify for the investment credit, and (2) whether petitioner's payments to a surety are deductible within the meaning of section 461(f).

## FINDINGS OF FACT

Some of the facts were stipulated and are so found. The stipulation of facts, and first, third, fourth, and fifth supplemental stipulations of facts, and the exhibits attached thereto, are incorporated herein by this reference.[2]

Petitioner timely filed its accrual basis consolidated Federal income tax returns for the taxable years in issue with either the

---

| C. F. Tank Lines, Inc. | 1970 |
|---|---|
| CF Temp Control, Inc | 1970 |
| Consolidated Freightways Corp. of Delaware | 1966–70, incl. |
| Consolidated Metco, Inc | 1966–70, incl. |
| Consoldiated Pacific Express, Inc | 1966–68, incl. |
| Consoldiated Warehouse Co. of California | 1966–70, incl. |
| Freightliner Corp | 1966–70, incl. |
| Freightliner Corp. (an Alabama corporation) | 1968–70, incl. |
| Freightliner Corp. (a Maine corporation) | 1968–70, incl. |
| Freightliner Corp. (a Nevada corporation) | 1968–70, incl. |
| Freightliner Corp. (a Tennessee corporation) | 1968–70, incl. |
| Freightliner Corp. (a West Virginia corporation) | 1968–70, incl. |
| Freightways Terminal Co | 1966–70, incl. |
| General Aluminum Corp | 1968–70, incl. |
| Transicold Corp | 1966–69, incl. |
| Transportation Equipment Rentals, Inc. | 1966–68, incl. |
| Westfab Manufacturing Co | 1966–70, incl. |

As common parent, petitioner Consolidated Freightways, Inc., is authorized to act in its own name on behalf of all its subsidiaries. Sec. 1.1502–77(a), Income Tax Regs.

[2]No second supplemental stipulation of facts was filed by the parties.

District Director of Internal Revenue, San Francisco, Calif., or the Director, Internal Revenue Service Center, Ogden, Utah.

On April 23, 1979, petitioner filed a motion for leave to amend petition to state two additional issues: (1) That respondent is estopped to deny that petitioner's terminal facilities qualify under section 38, and (2) that petitioner is entitled to an award of attorney's fees under 42 U.S.C. sec. 1988. Also, on April 23, 1979, petitioner filed a motion to sever and for a separate hearing wherein it moved to sever the attorney's-fees issue pending the outcome of the main case. Petitioner's motion for leave to file an amendment to its petition was granted on April 25, 1979. On that same date, petitioner's amendment to petition was filed. Petitioner's motion to sever was granted by order of the Court dated April 30, 1979.

Petitioner is a corporation duly organized and existing under and by virtue of the laws of the State of Delaware, with its principal place of business in San Francisco, Calif. Based on either the total amount of gross revenue or the number of route miles operated, petitioner, principally due to the operations of its subsidiary Consolidated Freightways Corp. of Delaware (CFCD), was one of the five largest motor common carriers of freight in the United States in each of the years 1966 through 1970. CFCD, the subsidiary corporation principally involved in this case, was at all times pertinent hereto a motor common carrier engaged in the transportation of general commodities freight. CFCD is a Delaware corporation. Either CFCD or its predecessors have been continuously engaged in the motor common carriage of freight since 1929.

Petitioner is, and was at all times relevant hereto, engaged in the common carriage of freight in 45 of the 48 contiguous States, Alaska, Canada, and the District of Columbia. Petitioner operated pursuant to licenses issued by the Interstate Commerce Commission (ICC) and appropriate State or local agencies. During the years 1966 through 1970 petitioner, principally through CFCD, operated between 159 million and 253 million route miles per year. Petitioner's gross revenues from the motor carriage of freight was $177,920,669 in 1966; $198,279,321 in 1967; $241,534,633 in 1968; $274,789,197 in 1969; and $261,444,920 in 1970. During each of the years 1966 through 1970, petitioner employed from 4,612 to 6,672 linehaul and local services drivers.

CFCD is principally a carrier of general commodities, as

opposed to a bulk carrier of special products. A bulk carrier of special products normally is involved in transportation of one material or one type of material requiring specially designed equipment particularly suited to the requirements of transporting that material in bulk. Examples would be oil and gasoline carriers and lumber carriers. A carrier of general commodities is involved in transportation of a wide variety of commodities. "General commodities" consist of more than 200,000 different categories of goods which can be shipped in a standard trailer.

During the period from 1966 through 1970, inclusive, CFCD owned or operated approximately 145 trucking terminals or other facilities through which a customer could engage the services of CFCD to pick up general commodities freight for shipment. During the period from 1966 to 1970, inclusive, CFCD operated a fleet of equipment including from 7,852 to 13,371 tractors (the motorized unit of tractor-trailer combinations) and trailers.

The transportation services furnished by petitioner during all periods relevant to this case involved the pickup of general commodities freight from a customer, carriage by a motor carrier unit consisting of a tractor and one or more trailers, and delivery to the recipient designated by the customer. The operations generally involved in such a shipment are local pickups of the freight shipments from customers, transfer from the local unit at an origination terminal, shipment on a linehaul unit to the dock facilities at a destinational terminal, transfer to a local delivery unit, and delivery by a local delivery unit to the designated recipient.

In many instances, a single linehaul trailer will not carry the freight from origination to destination terminal facilities without an intermediate transfer or reshipment. To make such a transfer, the linehaul unit will deliver the freight to one of several terminal facilities which provide break bulk operations (also referred to as "reship" operations). In break bulk operations, freight shipments to be delivered to various destinations will be unloaded at the break bulk terminal, and shipments for each destination will be consolidated with shipments from other trailers for the same destination and loaded into other linehaul trailer units which will carry the shipments to the destination terminals or to another break bulk terminal. Occasionally, a shipment may be involved in break bulk operations at more than

one interim terminal facility. In instances in which the contents of an entire trailer constitute a shipment to one consignee, delivery will be made by the linehaul unit without the use of the dock facilities at the destination terminal. Break bulk services are provided only at certain terminal facilities, and are separately recorded by the terminal facility. Break bulk services do not require the use of local pickup and delivery personnel or equipment. However, most of petitioner's break bulk terminals also provide inbound, outbound, and local delivery services from a portion of the same dock facility used for the break bulk operations.

Petitioner also provided local pickup and delivery services. Local units are often smaller than linehaul units to allow easier access to city streets. Local pickup and delivery drivers operate along regular routes generally organized by reference to the ZIP codes or commercial zones. The routes and sequence of deliveries, pickups, and loadings are planned in offices located at the terminal facilities. At the customer's designated point for pickup of the freight shipment, the driver will place the shipment in the trailer unit. Shipments may be picked up at the customers' docks at the same level as the trailer. In other situations, shipments are picked up from ground level and placed into the trailer. Some of the local pickup units are equipped with automatic lifts to assist the driver when it is necessary to load a shipment from ground level into the trailer of the local pickup unit. A shipment may consist of one or more of the various "general commodity" categories. Upon completing his pickup of freight shipments, the driver returns to the origination terminal.

The origination terminal is the freight terminal at which shipments are transferred from local pickup units into linehaul units for transportation to destination terminals. At the origination terminal, the local pickup trailer unit will be removed from the tractor and taken to the dock facilities where the shipment will be removed from the trailer and moved across the dock to the appropriate linehaul trailer unit. The operations performed at the dock facilities in the local pickup of freight and movement from the local pickup unit to the linehaul unit are referred to as "outbound services" because, from the point of view of the origination terminal, the freight shipments are moving out from the point of origin.

At the destination terminal, freight shipments are removed

from the linehaul unit and moved across the dock to a local delivery trailer unit and loaded in a sequence for local delivery. The local delivery unit then delivers the freight shipment to the recipient designated by the customer. The operations performed at the destination terminal facilities are referred to as "inbound services" because, from the point of view of the destination terminal, the freight is coming into the point of destination.

Thus, "linehaul services" consist of the long distance carrying of freight shipments. Petitioner may carry goods across the country, e.g., from Los Angeles to Boston. Linehaul services are provided in tractor and trailer units which are similar in appearance to many of the local pickup and delivery units, but which, because of original construction, usage, or capacity, are in condition to perform the more demanding linehaul services. For example, a linehaul tractor generally travels approximately 150,000 miles per year. The linehaul equipment is segregated from the local pickup and delivery equipment, and linehaul drivers are different individuals from the local pickup and delivery drivers. The linehaul drivers normally do not make continuous coast-to-coast trips. Instead, they operate on a relay system. Each driver is assigned to a particular terminal. From that terminal, the driver will drive the tractor and trailer unit approximately 8 to 10 hours to a relay point. At the relay point, another driver will replace the original driver. The original driver will rest for 8 hours. He will then drive another tractor and trailer unit back to the terminal to which he is assigned. The original trailer and shipments will be driven by one or more other drivers to the destination terminal or to a break bulk terminal.

During the taxable years 1966 through 1970, CFCD placed in service trucking terminal facilities or maintenance facilities or improvements to existing facilities[3] at each of the following locations:

---

[3]The parties have stipulated that, for purposes of this proceeding, investments in maintenance shops, office structures, and other items previously claimed by petitioner in its petition as investments in "Section 38 property," in the amounts specified below, do not qualify as "Section 38 property":

| Non-sec. 38 property | Amount of investments | | | | |
|---|---|---|---|---|---|
| | 1966 | 1967 | 1968 | 1969 | 1970 |
| Maintenance shops.......... | $598,884 | $142,326 | $19,703 | $864,523 | $182,558 |

| Location | Year placed in service | Description of project |
|---|---|---|
| South Plainfield, N.J | 1966 | New terminal facility |
| Santa Fe Springs, Calif | 1966 | New terminal facility |
| Long Beach, Calif | 1966 | Warehouse facility |
| Phoenix, Ariz | 1966 | Extension of dock |
| Sheboygan, Wis | 1966 | New terminal facility |
| Butte, Mont | 1966 | New terminal facility |
| Eugene, Oreg | 1966 | New terminal facility |
| Columbus, Ohio | 1966 | Extension of dock |
| Newark, N.J | 1966 | New terminal facility |
| Chicago, Ill | 1966 | New maintenance shop |
| Portland, Oreg | 1966 | New maintenance shop |
| Albany, N.Y | 1966 | Improvements to yard and dock |
| Detroit, Mich | 1967 | New maintenance shop |
| York, Pa | 1967 | Extension of dock |
| Mansfield, Ohio | 1967 | New terminal facility |
| Rock Island, Ill | 1967 | New terminal facility |
| Hartford-Springfield, Conn | 1967 | New terminal facility |
| Dayton, Ohio | 1967 | New terminal facility |
| Kansas City, Mo | 1967 | Extension of dock |
| Wichita, Kans | 1967 | New terminal facility |
| Buffalo, N.Y | 1967 | Extension of dock |
| Hayward, Calif | 1967 | New terminal facility |
| Boston, Mass | 1967 | Extension of dock |
| Orange, Calif | 1967 | Extension of dock |
| Cincinnati, Ohio | 1967 | Extension of dock |
| Newark, N.J | 1967 | Extension of dock |
| Warren, Ohio | 1968 | New terminal facility |
| San Diego, Calif | 1968 | New terminal facility |
| Rochester, N.Y | 1968 | New terminal facility |

| | | | | | |
|---|---|---|---|---|---|
| Office structures.... | $319,954 | $750,652 | $451,057 | $1,934,352 | $635,986 |
| Other............ | 3,082 | 28,031 | 13,562 | 37,909 | 11,153 |
| Total.......... | 921,920 | 921,009 | 484,322 | 2,836,784 | 829,697 |

The term "maintenance shops" includes costs for site preparation, floors, siding, roofs, structural elements, standard electrical wiring, sprinkler system, waterproofing, as well as certain other items. The term "office structures" includes all the components and contents of petitioner's office structure, unless an investment tax credit was allowed for such items in the statutory notice of deficiency. The term "other" includes the costs of various items such as customer identification signs, flagpoles, and small work buildings only in those locations in which investment tax credit was not allowed for such items in the statutory notice of deficiency.

| | | |
|---|---|---|
| Wilmington, Del | 1968 | New terminal facility |
| San Jose, Calif | 1968 | Extension of dock |
| Sacramento, Calif | 1968 | Extension of dock |
| Las Vegas, Nev | 1968 | New terminal facility |
| Boston, Mass | 1968 | New maintenance shop |
| Baltimore, Md | 1968 | Extension of dock |
| Columbus, Ohio | 1968 | Extension of dock |
| York, Pa | 1969 | Maintenance shop addition |
| Syracuse, N.Y | 1969 | Extension of dock |
| St. Louis, Mo | 1969 | New terminal facility |
| Patterson, N.J | 1969 | New terminal facility |
| South Plainfield, N.J | 1969 | Extension of dock |
| Salt Lake City, Utah | 1969 | New terminal facility |
| Orange, Calif | 1969 | New terminal facility |
| Akron-Canton, Ohio | 1969 | Improvements to yard |
| East Providence, R.I | 1969 | New terminal facility |
| Aurora, Ill | 1969 | New terminal facility |
| Cincinnati, Ohio | 1969 | New terminal facility |
| Toledo, Ohio | 1969 | New terminal facility |
| Memphis, Tenn | 1970 | New terminal facility |
| Houston, Tex | 1970 | New terminal facility |
| Buffalo, N.Y | 1970 | New terminal facility |

No part of the investments listed above is "suspension period property" as defined in section 48(h) of the Code, and all investments in projects or facilities listed above are "pretermination property" as defined in section 49(b) of the Code. All the facilities listed above are tangible property which were constructed, erected, or placed in service by petitioner after December 31, 1961, and with respect to which depreciation deductions are allowable.

At the time placed in service, each of the freight transshipment docks and other facilities listed above had a useful life of 8 years or more for the purpose of computing the allowance for depreciation under section 167 of the Code. All the above facilities were used by petitioner at all times relevant to this proceeding as integral parts of petitioner's business of furnishing transportation services.

The dispute with respect to the correct amount of investment tax credit to which petitioner is entitled is limited to the issue of whether the following items of property at petitioner's terminal facilities constitute "section 38 property": freight transshipment

docks; mercury-vapor dock lights; overhead dock doors; terminal yard fences; mercury-vapor shop lights. The amount of investment in these items in each of the taxable years at issue is described below:

|  | 1966 | 1967 | 1968 | 1969 | 1970 |
|---|---|---|---|---|---|
| Freight trans-shipment docks | $934,833 | $1,132,441 | $883,677 | $2,437,964 | $801,125 |
| Mercury-vapor dock lights | 8,193 | 12,531 | 79,877 | 35,045 | |
| Overhead dock doors | 45,817 | 64,108 | 65,187 | 92,140 | 47,526 |
| Terminal yard fences | 53,159 | 40,066 | 45,918 | 73,805 | 29,341 |
| Mercury-vapor shop lights | 17,221 | 4,598 | 449 | 16,506 | 8,070 |
| Total | 1,051,030 | 1,249,406 | 1,007,762 | 2,700,292 | 921,107 |
| Sec. 38 credit at 7% | 73,572 | 87,459 | 70,543 | 189,020 | 64,477 |

The following 43 freight transshipment dock projects are in issue in this proceeding:

| Location | Year placed in service | Description of project |
|---|---|---|
| South Plainfield, N.J | 1966 | New terminal facility |
| Santa Fe Springs, Calif | 1966 | New terminal facility |
| Phoenix, Ariz | 1966 | Extension of dock |
| Sheboygan, Wis | 1966 | New terminal facility |
| Butte, Mont | 1966 | New terminal facility |
| Eugene, Oreg | 1966 | New terminal facility |
| Columbus, Ohio | 1966 | Extension of dock |
| Newark, N.J | 1966 | New terminal facility |
| York, Pa | 1967 | Extension of dock |
| Mansfield, Ohio | 1967 | New terminal facility |
| Rock Island, Ill | 1967 | New terminal facility |
| Hartford-Springfield, Conn | 1967 | New terminal facility |
| Dayton, Ohio | 1967 | New terminal facility |
| Kansas City, Mo | 1967 | Extension of dock |
| Wichita, Kans | 1967 | New terminal facility |
| Buffalo, N.Y | 1967 | Extension of dock |
| Hayward, Calif | 1967 | New terminal facility |
| Boston, Mass | 1967 | Extension of dock |
| Orange, Calif | 1967 | Extension of dock |
| Cincinnati, Ohio | 1967 | Extension of dock |
| Newark, N.J | 1967 | Extension of dock |
| Warren, Ohio | 1968 | New terminal facility |

| | | |
|---|---|---|
| San Diego, Calif | 1968 | New terminal facility |
| Rochester, N.Y | 1968 | New terminal facility |
| Wilmington, Del | 1968 | New terminal facility |
| San Jose, Calif | 1968 | Extension of dock |
| Sacramento, Calif | 1968 | Extension of dock |
| Las Vegas, Nev | 1968 | New terminal facility |
| Baltimore, Md | 1968 | Extension of dock |
| Columbus, Ohio | 1968 | Extension of dock |
| Syracuse, N.Y | 1969 | Extension of dock |
| St. Louis, Mo | 1969 | New terminal facility |
| Patterson, N.J | 1969 | New terminal facility |
| South Plainfield, N.J | 1969 | Extension of dock |
| Salt Lake City, Utah | 1969 | New terminal facility |
| Orange, Calif | 1969 | New terminal facility |
| East Providence, R.I | 1969 | New terminal facility |
| Aurora, Ill | 1969 | New terminal facility |
| Cincinnati, Ohio | 1969 | New terminal facility |
| Toledo, Ohio | 1969 | New terminal facility |
| Memphis, Tenn | 1970 | New terminal facility |
| Houston, Tex | 1970 | New terminal facility |
| Buffalo, N.Y | 1970 | New terminal facility |

The following terminals at issue in this proceeding are constructed without overhead dock doors, i.e., without doors which may be raised to close off a truck loading space: Santa Fe Springs, Calif.; Phoenix, Ariz.; Hayward, Calif.; Orange, Calif.; Cincinnati, Ohio; St. Louis, Mo.; and Memphis, Tenn.

The following terminals are equipped with "towveyor" conveyor systems: Santa Fe Springs, Calif.; Hayward, Calif.; Aurora, Ill.; Salt Lake City, Utah; Cincinnati, Ohio; St. Louis, Mo.; Buffalo, N.Y.; and Kansas City, Mo. "Towveyors" are motorized chains usually set in the floor and around the perimeter of the dock. The chain is accessible through a slit in the floor and is kept in continuous motion by a small motor. Towveyors are used to move freight carts around the perimeter of the dock.

The towveyor in the St. Louis, Mo., terminal is designed to operate through an overhead chain rather than by a chain set into the concrete dock platform. The towveyor installed in the Kansas City, Mo., terminal, which was installed when that

terminal's dock extension was constructed, is an overhead-drive towveyor.[4] Each terminal yard is enclosed by a chain link fence. The terminal yard fences surrounding the facilities before us are used as integral parts of petitioner's business of providing transportation services.

During the years 1966 through 1970, petitioner placed into service the following 16 additions to existing docks. The location, year placed in service, number of trailer positions, and dimensions of the dock addition for each of the dock extensions at issue are set forth below:

| Dock extension location | Year placed in service | Number of new trailer positions | Dock extension dimensions |
|---|---|---|---|
| Baltimore, Md | 1968 | 32 | 170′ × 60′ |
| Boston, Mass | 1967 | 36 | 170′ × 75′ |
| Buffalo, N.Y | 1967 | 24 | 60′ × 105′ |
| Cincinnati, Ohio | 1967 | 24 | 80′ × 120′ |
| Columbus, Ohio | 1966 | 6 | 54′ × 36′ |
| Columbus, Ohio | 1968 | 24 | 60′ × 123′ |
| East Providence, R.I | 1969 | 14 | 60′ × 80′ |
| Kansas City, Mo | 1967 | 57 | 80′ × 340′ |
| Newark, N.J | 1968 | 25 | 100′ × 168′ |
| Orange, Calif. | 1967 | 16 | 50′ × 88′ |
| Phoenix, Ariz | 1966 | 12 | 55′ × 71′ |
| Sacramento, Calif. | 1968 | 11 | 60′ × 72′ |
| San Jose, Calif | 1968 | 20 | 54′ × 96′ |
| South Plainfield, N.J | 1969 | 32 | 60′ × 198′ |

Construction of the raised concrete platform portion of a freight transshipment dock is fundamentally the same for all the docks in issue. A mound of engineered fill is formed in the shape of the dock and partially compacted. The edges are then cut away to provide a space for construction of the perimeter of the dock. Heavy concrete footings are poured around the entire perimeter of the dock. The footings are normally 2 feet wide and 18 inches thick and form the foundation for the retaining wall. After the footings are hardened, wooden or metal forms are constructed into which cement is poured to mould a 12-inch-thick

---

[4]The towveyor originally installed in the Kansas City terminal, constructed prior to taxable year 1966, was of the conventional type pulled by a chain installed under the concrete dock platform. When the dock extension at that dock was placed in service in 1967, the entire towveyor was converted to the overhead type.

continuous concrete retaining wall which forms the perimeter of the dock. The perimeter dock wall is thicker at the corners and at those locations (generally every 22 feet) where metal uprights are subsequently bolted to the dock platform. Before concrete is poured into the forms, reinforcing rods are placed at 8- to 12-inch intervals both vertically and horizontally. Concrete is poured to a level of 42 to 44 inches above ground level. Reinforcing rods placed vertically in the walls extend 6 inches above the retaining wall. After the perimeter concrete dock wall is hardened, the forms are removed and the space between the perimeter dock wall and the compacted mound is filled with engineered fill, and the mound is further compacted.

At the same time the dock is being filled, wooden forms are set in the correct positions to form any pits needed to install equipment such as a towveyor or dock scales. Before the concrete platform is poured, a continuously welded edge angle is welded to the reinforcing rods protruding from the retaining walls. The edge angle is made from two strips of from 5- to 6-inch-wide steel plate continuously welded to each other at a 90-degree angle. After welding the edge angle to the vertical reinforcing rods, additional "anchors" made from reinforcing rod shaped into a hook are welded into the inside of the angle at approximately 18-inch intervals around the entire dock perimeter. Long sections of reinforcing rod are then laid into the anchors. When the concrete for the platform is poured, the anchors are firmly embedded in the dock. Once the edge angle is complete, 6 inches of concrete are poured over a reinforcing rod and steel mesh matrix for added strength, thus forming a platform 48 to 50 inches above ground level.

Each of the freight transshipment docks in issue is covered by a metal roof including a canopy which extends beyond the edge of the raised concrete platform. The metal roof consists of structural steel members and sheet metal for roofing or siding. Vertical steel columns, of sufficient height (usually 12 to 14 feet) to allow a clearance between the dock platform and cover ranging from 11 to 12 feet, are bolted to the concrete platform at 22-foot intervals on the sides of the dock. Crossbeams consisting of steel I-beams extend across the vertical columns without any additional support columns in the center of the dock. Additional roof framing members consisting of 6-inch-deep steel purlins run longitudinally across the crossbeams at 5- to 6-

foot spacings. Roof sheathing, consisting of enamelled sheet metal panels, is attached to the tops of the roof-framing members. At some terminals, skylights of translucent material are inserted in place of some metal panels to provide light. Each of the intervals of 22 feet is referred to as a bay and within each bay are two 11-foot-wide trailer positions. The canopy is designed to provide a 10-foot overhang on all sides.

While various persons were employed by petitioner to perform services at its terminal facilities during the years before us, the employee most substantially involved in the movement of freight at the dock was the "dockman." The dockman's principal activity is to load and unload freight from one trailer to another. This activity may be performed in a variety of ways. The most common method of loading and unloading is by hand. The boxes or packages of freight are removed from a trailer and placed on a four-wheel dock cart which has been pulled inside the trailer for easy loading. Large, bulky, or heavy materials are frequently moved by using a forklift operated by a dockman or a forklift operator. The forklift may be driven directly into a trailer to remove a load. A variety of other special equipment in addition to dock carts and forklifts, such as "handtrucks" and aluminum conveyor rollers, may be used in unloading a trailer. Once a dock cart or handtruck is loaded, the dockman will move the dock cart or handtruck out of the trailer and across the dock. At a terminal with a towveyor, the dockman will move the cart directly to the towveyor track, usually a distance of 20 feet, and attach the cart to the track. The dockman then returns to the trailer for further unloading. The loading process is the reverse of the unloading process.

Freight is sometimes "staged." The staging area is in the center of the dock. Staging is a term which describes the transitory or short-term storage of freight. Normally, there are two reasons for staging freight. First, shipments must be loaded into trailers in a proper sequence so that weight is distributed correctly and shipments to a given destination are kept together. Staging of freight facilitates this process. Secondly, freight may be staged for a short time to await arrival of the trailer on which the freight will ultimately be shipped. A dockman will therefore stage freight and remove freight from the staging area in the course of his duties. A dockman spends the predominate amount

of his time inside the trailers he is loading or unloading, rather than on the dock.

The following employees are normally never required to be present on the dock during the performance of their jobs: leadman, parts room; leadman, tire and lube; partsman; tire lube man; washer; shop clerk; transport operator; linehaul secretary; personnel manager; secretary; bill clerk; bill pusher; cashier interline; and payroll clerk. However, a secretary, bill clerk, or bill pusher may, in rare circumstances, go onto the dock. A shop manager, assistant shop manager, mechanic, mechanic's helper, shop foreman, leadman shop foreman, or inspector would be on the dock only in the rare circumstance of a breakdown of equipment on the dock.

Petitioner's docks and shops are equipped with high-intensity mercury-vapor lamps. These lamps are manufactured by the Holophane Lighting Co. and are designed to provide high-intensity, broad-beam illumination. The lamps are self-contained units and are installed by their being hung from a hook in the roof. The lamp is connected to a power source by inserting a standard plug into a standard power socket. Installation or removal of the mercury-vapor lamps requires no tools or equipment other than a ladder, and each lamp can be installed or removed in less than 30 seconds. At terminals placed in service after 1967, the mercury-vapor lamps serve as the only source of light during night hours, while at terminals placed in service prior to 1967, the mercury-vapor lamps are installed in addition to standard florescent fixtures. Of the terminals placed in service during 1967, those in Cincinnati, Ohio; Orange, Calif.; and Buffalo, N.Y., were equipped with both standard florescent lights and mercury-vapor lights. Mercury-vapor lamps installed in shops are designed with a double light fixture.

Several of the terminal facilities in issue herein were later sold by petitioner to third parties. In each case, the purchaser used the facility as a motor common carrier freight transshipment terminal.

During the normal course of its operation of motor vehicles as a common carrier, petitioner's employees and equipment are involved in traffic accidents which cause damage to its vehicles and cargo carried therein, as well as personal injuries to petitioner's employees and to the property and persons of third parties. Throughout the period 1961 to the present, and for a

substantial period prior to 1961, motor common carriers were required by Federal and State statutes and regulations to provide insurance coverage or to make other satisfactory arrangements to provide for the payment of claims which may arise against the carrier from such vehicular accidents.

In 1961, petitioners began a program of self-insurance designed to satisfy these Federal and State statutes and to provide for payment of damages caused by the operation of its motor vehicles in the common carriage of freight. In order to pursue its purpose of self-insurance, petitioner was required by the ICC and various State agencies to provide proof of financial responsibility. Petitioner provided the required proof of financial responsibility by entering into surety agreements with Seaboard Surety Co. (Seaboard) and causing bonds to be filed with the appropriate agencies.

On February 9, 1961, petitioner filed an Application for Surety Bond—Miscellaneous Form with Seaboard. This application read in pertinent part as follows:

THE UNDERSIGNED [petitioner] HEREBY AGREES:

\* \* \* \* \* \* \*

3rd. To indemnify and keep indemnified the Surety and hold and save it harmless from and against any and all liability, losses, costs, damages, attorneys' and counsel fees, and disbursements, and expenses of whatever kind or nature which the Surety may sustain or incur by reason or in consequence of having executed or procured the execution of the bond or bonds hereinabove applied for and renewal(s), continuation(s), extension(s) or successor(s) thereof and all other bonds heretofore or hereafter executed or procured for or at the request of the undersigned, and which the Surety may sustain or incur in taking any steps it may deem necessary, in making any investigation, in defending or prosecuting any actions, suits, or other proceedings which may be brought under or in connection therewith, and recovering or in attempting to recover salvage or any unpaid bond premium, in obtaining or attempting to obtain release from liability, or in enforcing any of the covenants of this agreement; and to pay over, reimburse and make good to the Surety, its successors or assigns, all money which the Surety or its representatives shall pay, or cause to be paid or become liable to pay, by reason of the execution of the bond or bonds \* \* \*

\* \* \* \* \* \* \*

5th. If for any reason the Surety shall be required or shall deem it necessary to set up a reserve in any amount to cover any contingent claim or claims, loss, costs, attorneys' fees and disbursements and/or expenses in connection with said bond or bonds by reason of default of the undersigned for any reason whatsoever, and regardless of any proceedings contemplated or taken by the principal or pendency of any appeal, the undersigned jointly and severally

hereby covenant and agree immediately upon demand to deposit with the Surety, in current funds, an amount sufficient to cover such reserve and any increase thereof, such funds to be held by the Surety as collateral, in addition to the indemnity afforded by this instrument, with the right to use such funds or any part thereof, at any time, in payment or compromise of any judgment, claims, liability, loss, damage, attorneys' fees and disbursements or other expenses; and if the Surety is required to enforce performance of this covenant by action at law or in equity, the costs, charges and expenses, including counsel or attorneys' fees which it may thereby incur, shall be included in such action and paid by the undersigned. * * *

\* \* \* \* \* \* \*

11th. In the event that it becomes necessary or advisable in the judgment of the Surety to control, administer, operate or manage any or all matters connected with the performance of any obligation or obligations which are the subject of its suretyship, for the purpose of minimizing any possible loss or ultimate loss to the undersigned and the Surety, the undersigned hereby expressly covenants and agrees that such action on the part of the Surety shall be entirely within its rights and remedies under the terms of this agreement and as Surety, and does hereby fully release and discharge the Surety, in this connection, from liability or all actions taken by it or for its omissions to act, except for deliberate and willful malfeasance.

\* \* \* \* \* \* \*

13th. It is understood and agreed that, as the execution of this agreement is an essential part of the consideration for the execution by the Surety of a bond or bonds, the failure to execute this instrument or, in the case the execution may be defective or invalid for any reason, such failure, defect or invalidity, shall not in any manner affect the validity of this instrument or the liability hereunder, and that this instrument shall be in full force and effect to the same extent as if such failure, defect or invalidity had not existed. This agreement, although executed subsequent to the issuance of any instrument referred to herein, has the same force and effect as though executed prior to the issuance of such instrument.

On March 1, 1961, petitioner entered into an agreement with Seaboard entitled the "Indemnity Agreement." This agreement read in pertinent part as follows:

1. The Indemnitors will pay when due all premiums for each of such bonds and shall at all times indemnify and keep indemnified the Surety and hold and save it harmless from and against any and all liability, losses, costs, and damages, attorneys' fees and counsel fees, and disbursements, and expenses of whatever kind or nature which the surety may sustain or incur by reason or in consequence of having executed or procured the execution of such bond or bonds and any renewal, hereafter executed or procured for or at the request of the Principal, and which the Surety may sustain or incur in taking any steps it may deem necessary in making any investigations, in defending or prosecuting any actions, suits or other proceedings which may be brought under or in connection therewith, or in recovering or attempting to recover salvage or any

unpaid bond premium, in obtaining or attempting to obtain release from liability, or in enforcing any of the covenants of this agreement; to pay over, reimburse and make good to the Surety, its successors or assigns, all money which the Surety or its representatives shall pay or cause to be paid or become liable to pay, by reason of the execution of such bond or bonds, and any renewal, continuance, extension or successor thereof, and all other bonds heretofore or hereafter executed or procured for or at the request of the Principal; and such payment to be made to the Surety as soon as it shall become liable therefore, whether the Surety shall have paid out such sum or any part thereof, or not.

\* \* \* \* \* \* \*

4. It is understood and agreed that as the execution of this agreement is an essential part of the consideration for the execution by the Surety of such bond or bonds, the failure to execute this instrument, or, in case the execution may be defective or invalid for any reason, such failure, defect or invalidity, shall not in any manner affect the validity of this instrument or the liability hereunder, and this instrument shall be in full force and effect to the same extent as if such failure, defect or invalidity had not existed. This agreement, although executed subsequent to the issuance of any instrument referred to herein, is of the same force and effect as though executed prior to the issuance of such instrument.

\* \* \* \* \* \* \*

6. It is expressly understood and agreed that the liability of the Indemnitors for premium payments shall be limited to the premium charged by the Surety for the period in which the Surety under its bond accepts additional liability. Upon cancellation of the bond, the liability of the Indemnitors for premiums arising after cancellation shall cease.

Also, on March 1, 1961, petitioner entered into an agreement with Seaboard entitled the "Collateral Agreement." The relevant terms of the Collateral Agreement provide:

WHEREAS, application has been and may hereafter be made to the Surety to execute or procure execution of a bond or bonds or policies on behalf of Principals or any of them, and

WHEREAS, the Surety has made it a condition precedent to executing any such bond or policy that its exposure at all times be adequately collateralized, upon the terms and conditions of the Agreement.

NOW, THEREFORE, in consideration of the premises and of the execution of any such bond or policy and of the mutual agreements herein contained, it is agreed that:

A. Principals shall forthwith deposit or cause to be deposited with Surety, as collateral, cash or securities acceptable to Surety, or both, having a total current value of not less than 100 percent of the aggregate of the reserves set up by the principals on claims for which Surety is or may be responsible under such bond or bonds or policies as security (a) against any and all liability, loss, costs, damages, expenses, and attorneys' fees arising or incurred in connection with any such bond or policy heretofore or hereafter procured by the Surety at

the instance or inquest [sic] of the Principal [sic] or any of them, and (b) for the performance of every agreement made by the Principals in connection with such bond or policy (including but not limited to Principals Indemnity Agreement in favor of Surety).

Principals shall promptly after the last day of each month furnish to the Surety full information concerning claims and claim reserves, on forms provided by the Surety. If at any time the value of the collateral on deposit with Surety shall be less than 100 percent of reserves on pending claims, Principals shall deposit or cause to be deposited as much additional collateral as may be required to bring the value of the collateral to such 100 percent.

At any time and without notice or legal process, in order to pay out of such collateral to itself or otherwise any amounts due or to become due, or in the event Principals or any of them, or any other owner of any such collateral, shall breach any of the terms of this or any other agreement relating to any of the bonds or policies aforesaid, the Surety may, but shall not be obliged to, sell any of said collateral at public or private sale to itself or others, or deposit, invest, convert, cash, exchange, renew or dispose of said collateral or the proceeds thereof in any other manner, as it may deem proper.

B. Within a reasonable time after receipt of written request of the Principals, Surety shall release such collateral as may be in excess of 100 percent of the then outstanding claim reserves.

C. At least quarterly each Principal shall regularly furnish the Surety with a signed financial statement as of the quarterly date and its operating statements for the previous quarter. The Surety shall have the right of access at all times during business hours to the records and books of account of the Principals with respect to all matters covered by any such bond or bonds, or policies.

D. Upon termination or cancellation of such bond or bonds or policies, all or any part of the collateral shall at the option of the Surety be held by it until its liability has been extinguished and the statutory period for filing claims thereunder has terminated.

Pursuant to the March 1, 1961, agreements between petitioner and Seaboard, Seaboard filed bonds on behalf of petitioner with the various State and Federal agencies, including the ICC, governing the areas within which petitioner operated.[5]

Pursuant to the March 1, 1961, agreements with Seaboard, petitioner deposited the following amounts with Seaboard in each of the years 1966 through 1970:

---

[5]Petitioner was not required to file bonds in Ohio, South Dakota, South Carolina, and the District of Columbia.

| Year | Amount | Year | Amount |
|------|--------|------|--------|
| 1966 | $174,078 | 1969 | $530,746 |
| 1967 | 128,336 | 1970 | (81,855) |
| 1968 | 199,000 | | |

In addition to the above deposits, petitioner paid annual premiums to Seaboard of approximately $50,000 to $60,000. As of December 31 of each of the following years, petitioner had the following amounts on deposit with Seaboard:

| Year | Amount | Year | Amount |
|------|--------|------|--------|
| 1965 | $784,395 | 1968 | $1,285,809 |
| 1966 | 958,473 | 1969 | 1,816,555 |
| 1967 | 1,086,809 | 1970 | 1,734,700 |

The amounts petitioner transferred to Seaboard as deposits pursuant to the March 1, 1961, agreements were equal to the full amount of the increase in petitioner's estimated liability to third parties for claims by such third parties against petitioner for damages arising from traffic accidents for the year of the transfer; but in no event did petitioner's transfers, in respect of any one claim, exceed 100 percent of Seaboard's potential liability therefor under the various bonds. In turn, Seaboard's liability as surety did not exceed the limits stated in the bonds.[6] The timing and amount of petitioner's transfers to Seaboard were as were specified in the collateral agreement and were not subject to the discretion of petitioner. Under the various agreements for filing the surety bonds, in the event of petitioner's default, Seaboard would have used the amounts transferred to Seaboard to pay claims. Seaboard posted bonds with respect to bodily injury and property damage to third parties or their property and damage to freight shipments carried by petitioner resulting from, e.g., vehicular accidents.

Each claim against petitioner with respect to which petitioner transferred an amount to Seaboard pursuant to the March 1, 1961, agreements was processed by the Insurance & Claims

---

[6]A copy of a bond Seaboard filed with the United States effective Jan. 1, 1969, provides, for example, that:

"The Surety shall not be liable for an amount in excess of $2,500 in respect of the loss of or damage to property belonging to shippers or consignees carried on any one motor vehicle at any one time, nor in any event for an amount in excess of $5,000 in respect of any loss of or damage to or aggregate of losses or damages of or to such property occurring at any time and place."

Division of Consolidated Freightways, Inc. (claims division), in Portland, Ore. The claims division prepared a file for each such claim which contained all the correspondence, reports, agreements, and other documents pertinent to each claim (referred to hereinafter as the claim file). On the cover of each claim file, the amount which it was estimated that petitioner would be required to pay and the amount of all payments made were entered. The amount on deposit with Seaboard at the end of each year, 1965 through 1970, was the total of the amounts of estimated liability for each claim set forth on the claim file cover at that date, up to the limits set by the various bonds involved.

In the usual case, upon the occurrence of a vehicular accident, petitioner's driver would prepare a report of the accident which would then be submitted to the terminal manager and to the claims division. The claims division would then determine the amount of petitioner's estimated liability for each claim based upon the driver's report, police reports, appraisals from adjusters, medical reports, and reports from attorneys, copies of which were placed in each claim file. The amount of estimated liability would then be entered on the cover of each claim file. As the claims were evaluated and settlements negotiated, petitioner's claims division would make payments directly to the claimants or their representatives. As payments were made, each payment would be entered on the cover of the claim file and the amount of petitioner's remaining estimated liability (sometimes referred to as a "reserve" or "unpaid claim") would be reduced to reflect the payment. Payments of claims were made directly by the claims division. Adjustments were also made to increase or decrease the amount of petitioner's estimated liablility based upon subsequent developments and additional information. Upon satisfaction of a claim in full, expiration of the statute of limitations, or other similar event which terminated petitioner's liability for a claim, the claim file would be marked "closed" and the amount of petitioner's estimated liability on that claim reduced to zero.

Petitioner's claims division regularly reviewed the reserve outstanding on each of the open claim files. The aggregate amount of the outstanding open claim reserves was compared to the balance held by Seaboard. If the total outstanding reserve amount was higher than the total amount held by Seaboard, a transfer was made to raise the amount to 100 percent of the

outstanding claim reserves. If the total reserve amount was less than petitioner's deposits with Seaboard, petitioner would request the return of the excess. In every instance in which petitioner's insurance and claims division determined that the balance of outstanding open claim reserves was greater than the total balance of deposits, petitioner increased the deposits accordingly. Seaboard regularly audited the amount of petitioner's estimated liabilities on outstanding claims, based upon petitioner's reports or accountings, to determine if petitioner had transferred adequate deposits to Seaboard under the March 1, 1961, agreements. Petitioner's claims division was usually very accurate in estimating petitioner's liabilities.

During the years in issue, petitioner borrowed funds from the Bank of America under a revolving credit agreement. Petitioner also borrowed from other banks, referred to herein as "participating banks," pursuant to that same agreement. Petitioner had an oral understanding with the Bank of America, and thereby with each participating bank, that petitioner would maintain funds in non-interest-bearing accounts at such banks in amounts equal to a certain percentage of each bank's average loan to petitioner for some prior period of time. The amounts required to be placed in non-interest-bearing accounts with the participating banks pursuant to the oral understanding are referred to as "compensating balance requirements."

From time to time during the years 1966 through 1970, amounts on deposit with Seaboard were transferred from one bank to another or from a bank account into an investment. On occasion, petitioner would request Seaboard to transfer amounts on deposit with Seaboard from one bank to another in order for such amounts to be available to meet petitioner's "compensating balance requirements" at various banks. In each such instance, a request for transfer was sent by petitioner to Seaboard for Seaboard's consideration and approval. If petitioner's request was approved by Seaboard, Seaboard made the transfer of the deposits. All amounts transferred to the accounts established by Seaboard were under the absolute control of Seaboard. Only Seaboard officers had authority to make withdrawals or transfers of amounts from those accounts. During the years 1966 through 1970, Seaboard approved each of petitioner's written requests and made the requested transfers of the deposits. The amounts deposited by petitioner with Seaboard, and by Sea-

board with various banks, earned income. This income was reported by petitioner and served to reduce petitioner's collateral obligations.

The relationship between petitioner and Seaboard terminated on August 1, 1977. Subsequent to the termination of the arrangement between petitioner and Seaboard, Seaboard continued to maintain deposits made by petitioner in accounts in Seaboard's name. In February 1978, petitioner, through John C. Miller, vice president and manager of petitioner's Insurance & Claim Division, requested a release of $1,500,000 of the deposits held by Seaboard because the outstanding reserves on claims covered by surety bonds issued by Seaboard had been reduced by that amount. This request was refused.

Petitioner has consistently, since 1961, claimed deductions for deposits paid to Seaboard and has reported deposits returned to petitioner by Seaboard as income, with the exception of 1965 when deposits paid to Seaboard were not deducted due to inadvertence. Deductions and income from deposits paid or refunded were shown on Schedule M-1 of petitioner's returns for each of the years 1966 through 1970.

## OPINION

The first issue with which we must deal is petitioner's claim that respondent should be "estopped" to deny that petitioner's docks qualify for the investment credit.[7] Petitioner would, apparently, raise estoppel on the basis of (1) Rev. Rul. 68–1, 1968–1 C.B. 8, and (2) a Form 870 petitioner executed with respect to its taxable years 1961 through 1964. Separately, petitioner contends that respondent abused his discretion in not making Rev. Rul. 71–203, 1971–1 C.B. 7, purely prospective in operation.

The gravamen of petitioner's argument with respect to Rev. Rul. 68–1 is that:

respondent published Revenue Ruling 68–1 * * * in early 1968 and that during 1968 the Internal Revenue Service applied that Revenue Ruling to the facts in this case to determine that under that Revenue Ruling petitioner's docks qualified as Section 38 property. After publication of Revenue Ruling 68–1 petitioner placed in service 22 of the 43 docks in issue. Only after those docks

---

[7] "Estoppel," as used by petitioner, no doubt includes both "estoppel in pais" and "equitable estoppel."

were constructed and after publication of Revenue Ruling 71–203 * * * , in 1971 did respondent seek to change its position and contend Revenue Ruling 68–1 did not apply to such docks and that such docks were not Section 38 property.

Further, petitioner argues that it has been greviously injured by respondent's alleged change in position because petitioner could have constructed its docks in a different manner.

Respondent argues that petitioner must fail because it has not established any of the elements of estoppel or abuse of discretion. Respondent argues that he never made a determination that Rev. Rul. 68–1 applied to petitioner's docks and that, therefore, there was no representation upon which petitioner could rely. Respondent argues that the Form 870 waiver petitioner signed was not a determination and, by its terms, cannot bind the Commissioner. Further, respondent points out that the Form 870 covered taxable years not before the Court. Respondent also argues that Rev. Rul. 71–203 did not modify or revoke Rev. Rul. 68–1 because the two rulings dealt with completely different topics. Finally, respondent argues that petitioner has failed to show reasonable reliance and detriment.

Rev. Rul. 68–1 dealt with the qualification for the investment tax credit of certain improvements made to a trucking terminal, viz, "paved yard, concrete aprons, concrete pads, yard bumpers, yard lighting, and a fence surrounding the terminal." The ruling concluded that:

in this case the improvements consisting of a paved yard, concrete aprons, concrete pads, yard bumpers, and yard lighting made to the trucking terminal by the taxpayer, which is engaged in the business of furnishing transportation services, are "section 38 property" for investment credit purposes. However, the fence surrounding the terminal does not qualify as "section 38 property." [Rev. Rul. 68–1, 1968–1 C.B. 8, 9.]

Rev. Rul. 71–203 dealt with the qualification under section 38 of a "docking facility" identical in all operable aspects with the docks before us. That ruling concluded that the docking facility was a "building." The Form 870 mentioned by petitioner was dated October 24, 1968, and dealt with petitioner's taxable years 1961 through 1964. It would appear from petitioner's protest made on March 28, 1968, with respect to its taxable years 1962, 1963, and 1964, that the primary issue with respect to those years was the useful life of the assets involved for section 38 purposes, not their original qualification as section 38 property.

The elements of estoppel are well known.[8] Petitioner must fail on this claim because it cannot show a primary element of its case, i.e., "representation." We think it clear that the two revenue rulings at issue dealt with completely different questions of law and fact. See *Consolidated Freightways, Inc. v. United States*, docket No. 168–69, Opinion of Trial Judge (Ct. Cl. 1979, 44 AFTR 2d 79–5230, 79–2 USTC par. 9440). This being the case, and in the absence of a relevant private letter ruling or other indication that respondent had made any sort of binding representation to petitioner, there can be no estoppel, of either sort, and no abuse of discretion. See *Automobile Club of Michigan v. Commissioner*, 353 U.S. 180, 184 (1957); *Malinowski v. Commissioner*, 71 T.C. 1120, 1128–1129 (1979).

We now turn to the merits. The first substantive issue with which we must deal is the allowability of certain claimed investment credits taken with respect to petitioner's freight transshipment docks, mercury-vapor dock and shop lights, overhead dock doors, and terminal yard fences.

The relevant law remained unchanged during the taxable years before us. Section 38 provided as follows:

SEC. 38. INVESTMENT IN CERTAIN DEPRECIABLE PROPERTY.

(a) GENERAL RULE.—There shall be allowed, as a credit against the tax imposed by this chapter, the amount determined under subpart B of this part.

(b) REGULATIONS.—The Secretary or his delegate shall prescribe such regulations as may be necessary to carry out the purposes of this section and subpart B.

Section 48, which is part of "subpart B," provided in relevant part as follows:

SEC. 48. DEFINITIONS: SPECIAL RULES.

(a) SECTION 38 PROPERTY.—

(1) IN GENERAL.—Except as provided in this subsection, the term "section 38 property" means—

(A) tangible personal property, or

(B) other tangible property (not including a building and its structural components) but only if such property—

(i) is used as an integral part of manufacturing, production, or

---

[8]They are: "(1) conduct constituting a *representation* of material fact; (2) actual or imputed *knowledge* of such fact by the representor; (3) *ignorance* of the fact by the representee; (4) actual or imputed expectation by the representor that the representee will act in *reliance* upon the representation; (5) *actual reliance* thereon; and (6) *detriment*." T. Lynn & M. Gerson, "Quasi-Estoppel and Abuse of Discretion as Applied Against the United States in Federal Tax Controversies." 19 Tax L. Rev. 487, 488 (1963–64). Emphasis added.

extraction or of furnishing transportation, communications, electrical energy, gas, water, or sewage disposal services, or

(ii) constitutes a research or storage facility used in connection with any of the activities referred to in clause (i), or

*    *    *    *    *    *    *

Such term includes only property with respect to which depreciation (or amortization in lieu of depreciation) is allowable and having a useful life (determined as of the time such property is placed in service) of 4 years or more.

Petitioner does not contend that the docks are "tangible personal property." Our inquiry, therefore, is limited to whether the docks are "other tangible property." The parties are in agreement that the docks will qualify as other tangible property unless they are "buildings" within the meaning of section 48. During all the taxable years in issue, the regulations[9] defined "building" as follows:

Sec. 1.48-1 Definition of section 38 property.

(e) *Definition of building and structural components.* (1) Buildings and structural components thereof do not qualify as section 38 property. The term "building" generally means any structure or edifice enclosing a space within its walls, and usually covered by a roof, the purpose of which is, for example, to provide shelter or housing, or to provide working, office, parking, display, or sales space. The term includes, for example, structures such as apartment houses, factory and office buildings, warehouses, barns, garages, railway or bus stations, and stores. * * * Such term does not include (i) a structure which is essentially an item of machinery or equipment, or (ii) an enclosure which is so closely combined with the machinery or equipment which it supports, houses, or serves that it must be replaced, retired, or abandoned contemporaneously with such machinery or equipment, and which is depreciated over the life of such machinery or equipment. Thus, the term "building" does not include such structures as oil and gas storage tanks, grain storage bins, silos, fractionating towers, blast furnaces, coke ovens, brick kilns, and coal tipples.

---

[9]This subparagraph was amended by T.D. 7203, 1972-2 C.B. 12, 24 (effective Aug. 25, 1972) to read as follows:

"(e) *Definition of building and structural components.* (1) * * * Such term does not include (i) a structure which is essentially an item of machinery or equipment, or (ii) a structure which houses property used as an integral part of an activity specified in section 48(a)(1)(B)(i) if the use of the structure is so closely related to the use of such property that the structure clearly can be expected to be replaced when the property it initially houses is replaced. Factors which indicate that a structure is closely related to the use of the property it houses include the fact that the structure is specifically designed to provide for the stress and other demands of such property and the fact that the structure could not be economically used for other purposes. Thus, the term "building" does not include such structures as oil and gas storage tanks, grain storage bins, silos, fractionating towers, blast furnaces, basic oxygen furnaces, coke ovens, brick kilns, and coal tipples."

These regulations have been interpreted to present a bifurcated test, i.e., the "appearance" test and the "purpose" or "function" test. Congress intended that the term "building" be given its commonly accepted meaning. Technical Explanation of the Bill, 1962-3 C.B. 841, 858. Because the regulation is a reasonable interpretation of Congress' intent on this point, it must be given great respect and may not be overruled except for weighty reasons. *Fawcus Machine Co. v. United States*, 282 U.S. 375, 378 (1931); *Commissioner v. South Texas Lumber Co.*, 333 U.S. 496, 501 (1948). As the regulations before us are "legislative," i.e., promulgated pursuant to an express congressional mandate, they are binding upon this Court, and are second only to the statute itself. *Yellow Freight System, Inc. v. United States*, 538 F.2d 790, 796 (8th Cir. 1976), revg. and remanding 413 F. Supp. 357 (W.D. Mo. 1975); *Kramertown Co. v. Commissioner*, 488 F.2d 728, 730 (5th Cir. 1974). See *Joseph Weidenhoff, Inc. v. Commissioner*, 32 T.C. 1222, 1241-1242 (1959).

Petitioner argues both the "appearance" and "functional" tests. Thus it argues that its docks are not buildings because they do not enclose space within "normal" walls and therefore do not "appear" to be buildings. Second, it argues that the docks are not buildings under the "functional" test because they function as specially designed and constructed equipment used as an integral part of petitioner's business of providing transportation services and do not function to provide a working space for employees. Further, petitioner argues that, even if we do not view the entire dock structure as "equipment," the raised concrete platform is certainly "equipment" which the dock roof merely houses. Under this argument, the platform would not be a building because it would be "equipment" and the roof would qualify for the credit because it is a structure which houses property, i.e., the platform, used as an integral part of the business of providing transportation services, which can clearly be expected to be replaced if the dock platform into which it is set is replaced.

Respondent argues, on the other hand, that the dock facilities are "buildings" within the meaning of section 1.48-1(e)(1), Income Tax Regs., under both the appearance and purpose tests, and that they do not qualify under either the "equipment" or "integral part" exclusions.

As mentioned, the regulations state a bifurcated test which

focuses upon (1) the "appearance" and (2) the "purpose" or "function" of the structure. See *Catron v. Commissioner*, 50 T.C. 306, 310–311 (1968); *Consolidated Freightways, Inc. v. United States*, 223 Ct. Cl. 432, 620 F.2d 862 (1980); *Yellow Freight System, Inc. v. United States, supra* at 796; *Sunnyside Nurseries v. Commissioner*, 59 T.C. 113, 119 (1972). Recently, this Court has tended, however, to focus initially upon the "functional" test as the primary means of determining building status (see *Valmont Industries, Inc. v. Commissioner*, 73 T.C. 1059, 1072 (1980)), although not always to the exclusion of the perhaps less precise and more visceral "appearance" test. See *Lesher v. Commissioner*, 73 T.C. 340, 366 (1979); *Scott Paper Co. v. Commissioner*, 74 T.C. 137 (1980). But see *Moore v. Commissioner*, 58 T.C. 1045, 1052–1053 (1972). The problem arises because several cases have found structures which obviously appear to be buildings, not to be buildings for section 38 purposes. See *Brown & Williamson Tobacco Corp. v. United States*, 369 F. Supp. 1283 (W.D. Ky. 1973), affd. per curiam 491 F.2d 1258 (6th Cir. 1974) (tobacco sheds); *Brown-Forman Distillers Corp. v. United States*, 205 Ct. Cl. 402, 499 F.2d 1263, 1270–1271 (1974) (whiskey maturation facilities); *Thirup v. Commissioner*, 508 F.2d 915 (9th Cir. 1974), revg. 59 T.C. 122 (1972) (greenhouses).

Substantially identical investment credit issues as are presently before us were dealt with in *Yellow Freight System, Inc. v. United States, supra* (*Yellow Freight*), and *Consolidated Freightways, Inc. v. United States, supra* (involving petitioner's taxable years 1962, 1963, and 1964). In *Yellow Freight*, the Eighth Circuit applied both the "appearance" and "function" tests in determining whether truck transshipment docks substantially identical to those before us qualified for the investment tax credit. Applying, and perhaps emphasizing, the appearance test, the court found that "The docks at issue clearly resemble buildings in their design and structural appearance." *Yellow Freight System, Inc. v. United States, supra* at 796. The court then found that the docks were buildings. 538 F.2d at 798. The Court of Claims in *Consolidated Freightways, Inc. v. United States*, 223 Ct. Cl. at ___ , 620 F.2d at 871, also applied both tests. The court found that petitioner's docks both "appeared" to be buildings, despite the lack of traditional walls, and "functioned" as buildings.

In applying the latter test, the court focused on the question

of " 'whether the structures provide working space for employees that is more than merely incidental to the principal function or use of the structure.'" *Consolidated Freightways, Inc. v. United States,* 223 Ct. Cl. at ___ , 620 F.2d at 871, quoting *Brown-Forman Distillers Corp. v. United States, supra* at 1271. In reaching its conclusion that petitioner's docks were "buildings," the Court of Claims examined both the quantity and quality of human activity on the docks. 223 Ct. Cl. at ___ , 620 F.2d at 873.

We agree with both the Eighth Circuit and Court of Claims that docks such as those before us are "buildings," and hence, fail to qualify for the investment credit. Because, however, we believe that the functional test is dispositive, at least on the facts of this case, we shall not reach the appearance test.

The functional test inquires whether "the purpose" of the structure at issue is a purpose ejusdem generis to the purposes described by example in the regulations, i.e., "to provide shelter or housing, or to provide working, office, parking, display, or sales space." Sec. 1.48–1(e)(1), Income Tax Regs. The regulations ask whether the docks perform a function similar to "apartment houses, factory and office buildings, warehouses, barns, garages, railway or bus stations, and stores." Sec. 1.48–1(e)(1), Income Tax Regs. We think it clear that they do. In making this determination an important, but not the sole, point of inquiry is the quantity and quality of human activity in the structure. *Consolidated Freightways, Inc. v. United States,* 223 Ct. Cl. at___, 620 F.2d at 873. See *Thirup v. Commissioner,* 59 T.C. at 128; *Sunnyside Nurseries v. Commissioner,* 59 T.C. at 121. As we do not believe this test different in effect from that announced by the Ninth Circuit in *Thirup,* which focuses on the "nature" of the human activity,[10] we apply our test. *Golsen v. Commissioner,* 54 T.C. 742 (1970).

We think it obvious from the record that a substantial purpose of the docks is to provide a working space in which the dockworkers can efficiently move freight. A great deal of evidence was included in the record with respect to what percent

---

[10]"We find the distinction based on the *amount* of human activity unpersuasive. The proper inquiry, which goes to the *nature* of the employee activity inside the structures, is 'whether the structures provide working space for employees that is more than merely incidental to the principal function or use of the structure.' [*Thirup v. Commissioner,* 508 F.2d 915, 919 (9th Cir. 1974), revg. 59 T.C. 122 (1972).]"

of which sort of worker's time was spent on the docks. It is unnecessary to replicate all this evidence, here. Suffice it to say that the purpose of the dock, to move freight, is accomplished primarily by the efforts of those who work on the dock. The purpose of the dock is far more than "incidentally" to provide working space for the employees of petitioner. Human activities *inside* the docks were essential to the function of the docks. Both the quantity and quality ("nature") of work performed on the docks is sufficient, in our minds, to qualify them as buildings. Compare *Brown-Forman Distillers Corp. v. United States, supra,* and *Satrum v. Commissioner,* 62 T.C. 413, 417 (1974) (reviewed by the Court), with *Valmont Industries, Inc. v. Commissioner, supra.*[11]

Petitioner argues that the docks are excepted from the definition of building by the regulations because the docks are either (1) essentially items of machinery or equipment or (2) structures which house property used as an integral part of providing transportation services. Certainly, a structure otherwise qualifying for the credit will not be classified as a building if it is a structure which is essentially an item of machinery or equipment. See *Scott Paper Co. v. Commissioner,* 74 T.C. 137 (1980). Both contentions, however, must fail in this case.

As was just indicated, the docks here at issue do no more than provide a working space in which the dock workers, utilizing a variety of pieces of equipment, move freight. The docks provide the setting in which freight is moved, they are not of themselves the medium through which the men act to move freight. They are no more an item of machinery to move freight than the building in which the Tax Court is housed is an item of equipment to produce our opinions.

As the dock, as a whole, is not an item of machinery or equipment, we are of the view that the dock platform cannot be isolated and deemed to be an item of machinery or equipment. Thus, it follows that the roof, considered alone, cannot be said to "house" property used as an integral part of providing transportation services. There is no item of machinery in issue, in or on

---

[11]In passing, we note that the docks, here, also "appear" to be buildings. While many have doors on all sides, this cannot void the fact that the doors are hung on walls which enclose space—whether or not the doors are open. The petitioner does not fare any better under this test.

the docks, separate from the dock itself. The dock roof "houses" the dock floor only to the same extent that any building's roof "houses" the building's floor. Similarly, the dock's floor is just as much an item of machinery as is any building's floor. We conclude that the docks are "buildings" and not section 38 property.

The overhead doors and mercury-vapor lamps may be dealt with as a unit. The issue here is whether these items are structural components of the docks or are "personal property." Petitioner argues that these items are not structural components of the docks because they are not permanently affixed to the docks. Respondent applies a "functional use" test and argues that, while the doors and lamps can be removed from the dock facility, removability is not the sole criterion. Rather, argues respondent, as the doors and lights at issue functioned the same as doors and lights permanently installed, which would be structural components, petitioner's doors and lights should be treated as if they were permanently installed.

The relevant regulations read as follows:

Sec. 1.48–1(e) *Definition of building and structural components.* \* \* \*

(2) The term "structural components" includes such parts of a building as walls, partitions, floors, and ceilings, as well as any permanent coverings therefor such as panelling or tiling; windows and doors; all components (whether in, on, or adjacent to the building) of a central air conditioning or heating system, including motors, compressors, pipes and ducts; plumbing and plumbing fixtures, such as sinks and bathtubs; electric wiring and lighting fixtures; chimneys; stairs, escalators, and elevators, including all components thereof; sprinkler systems; fire escapes; and other components relating to the operation or maintenance of a building.

The thrust of this regulation is that an item will be a "structural component" of a building if it is an integral and permanent part of the structure, the removal of which will affect the essential structure of the building. However, this regulation must be interpreted in light of the Senate report which says:

Tangible personal property is not intended to be defined narrowly here, nor to necessarily follow the rules of State law. It is intended that assets accessory to a business such as grocery store counters, printing presses, individual air-conditioning units, etc., even though fixtures under local law, are to qualify for the credit. Similarly, assets of a mechanical nature, even though located outside a building, such as gasoline pumps, are to qualify for the credit. [S. Rept. 1881, 87th Cong., 2d Sess. (1962), 1962–3 C.B. 707, 722.]

We believe that the rule applicable to this question was

properly stated by the Eighth Circuit in the case of *Minot Federal Savings & Loan Assn. v. United States,* 435 F.2d 1368 (8th Cir. 1970). There, the issue was whether certain movable wall partitions were personal property or structural improvements. The Commissioner advocated a functional use test, i.e., as the partitions were used as walls, and as walls are, in general, structural components of buildings, the partitions should be treated as "structural components." The court said at page 1371:

> We do not construe the Treasury Regulation as suggesting or requiring any functional or equivalent test. The regulation in discussing the structural components speaks of a building or other *inherently permanent* structure as being considered tangible personal property. Again, a building is defined in the regulation as meaning a structure or edifice enclosing a space within its walls usually covered by a roof. Here, the building was constructed and completed without the movable partitions and certainly does not include a wall divider any more than it would an individual window air-conditioning unit.

See, e.g., *Moore v. Commissioner,* 58 T.C. 1045, 1052 (1972).

Respondent's argument in this case remains unchanged from that rejected by the *Minot* and *Moore* decisions. Essentially, respondent argues that, if items which are not permanently installed are intended to remain in place for the foreseeable future, then these items should be treated identically with items that are permanently installed. Since the lamps and doors herein serve the same function or use as permanently installed lamps and doors, which would clearly be "structural components," we should treat them as structural components which fail to qualify for the investment credit.

We are unpersuaded. The facts clearly show that the doors and lights are temporary attachments to the docks and are clearly not structural components thereof. They can be easily and quickly removed. A door can be hung in one truck bay one day and the next day be removed or moved to another bay. The lights can be hung from any hook and plugged into any regular socket. These items, therefore, are not structural components and do not "relate to the operation or maintenance" of the docks within the meaning of section 1.48–1(e)(2), Income Tax Regs. They qualify for the credit.

We recognize that the Court of Claims has recently held that doors apparently identical to those before us failed to qualify for the credit. This finding was, however, based at least in part upon that court's finding that "Plaintiff has failed to demonstrate, by

citation of authority or otherwise, any basis for concluding that the overhead doors * * * were not structural components of a building." *Consolidated Freightways, Inc. v. United States*, docket No. 168–69, Opinion of Trial Judge (Ct. Cl. 1979, 44 AFTR 2d 79–5230, 79–2 USTC par. 9440). Petitioner has remedied this failure in its proof in this Court.

The final investment credit issue before us deals with the petitioner's claim for the fences it installs around its dock facilities. The fences are installed around only the dock facility, itself, and do not protect, for example, the dockworkers' cars. The fences are used to provide security for the freight in petitioner's possession. Indeed, it would appear that the United States requires this added security before petitioner can carry bonded merchandise in its "Sea Vans."

While the fences are clearly depreciable assets, they cannot qualify for the credit as "tangible personal property" because of the explicit exclusion of the regulations. Sec. 1.48–1(c), Income Tax Regs. If at all, therefore, the fences must qualify as "other tangible property." In this connection, the issue is whether the fences are used as an integral part of furnishing transportation services within the meaning of section 48(a)(1)(B)(i). The regulation provided that:

Sec. 1.48–1(d)(4) *Integral part.* * * * Property is used as an integral part of one of the specified activities if it is used directly in the activity and is essential to the completeness of the activity. Thus, for example, in determining whether property is used as an integral part of manufacturing, all properties used by the taxpayer in acquiring or transporting raw materials or supplies to the point where the actual processing commences (such as docks, railroad tracks and bridges), or in processing raw materials into the taxpayer's final product, would be considered as property used as an integral part of manufacturing.

We believe that petitioner's fences are used directly in its business of providing transportation services and are essential to that activity. Indeed, it is doubtful if petitioner could sucessfully operate as a freight mover at all if it could not provide reliable, including theftproof, transportation services. The fences, therefore, qualify for the credit.

Our holding on this point is supported by our case in *Spalding v. Commissioner*, 66 T.C. 1017 (1976). There we dealt with a fence around a vehicle-wrecking yard. We held that the fence qualified as an item used as an integral part of "manufacturing" or "production." Before us, respondent explicitly did "not

contend that the instant case is distinguishable from *Spalding"* but asked the Court to reconsider our holding therein. We have reconsidered our holding and affirm it. Further, this identical issue was presented to the District Court in *Yellow Freight System, Inc. v. United States*, 413 F. Supp 357, 371 (W.D. Mo. 1975), revd. and remanded on other grounds 538 F.2d 790 (8th Cir. 1976). There, the court reached the same conclusion we have here.

Finally, we must decide the correctness of petitioner's claimed deductions with respect to its payments to Seaboard. Four documents are relevant to this consideration—the application form, the indemnity agreement, the collateral agreement, and the bonds filed by Seaboard with the various jurisdictions requiring them, samples of which were included in the record. By the indemnity agreement, petitioner bound itself to indemnify Seaboard against any loss Seaboard might incur as a result of its execution of the bonds Seaboard was to file.[12] By the bonds, Seaboard, as surety, bound itself to make good any damages for which petitioner was liable, within the limits set by law. By the collateral agreement, petitioner bound itself to deposit with Seaboard 100 percent of any claim reserve established by petitioner's claim division with respect to any claim against petitioner for which Seaboard might be liable.[13] The application form repeated all these provisions.

Both parties agree that the claimed deductions are not allowable except to the extent described in section 461(f). Further, both sides agree that the operative provision of section 461(f), for purposes of this case, is section 461(f)(2). Respondent

---

[12]The indemnity agreement stated in pertinent part as follows:

"1. The Indemnitors will * * * indemnify and keep indemnified the Surety and hold and save it harmless * * * ; to pay over, reimburse and make good to the Surety, its successors or assigns, all money which the Surety or its representatives shall pay, or cause to be paid or become liable to pay * * * , by reason of the execution of such bond or bonds * * * "

[13]The collateral agreement stated in pertinent part as follows:

"A.  * * * deposit or cause to be deposited with Surety, as collateral, cash or securities acceptable to Surety, or both, having a total current value of not less than 100% of the aggregate of the reserves set up by the principals on claims for which Surety is or may be responsible under such bond or bonds or policies as security (a) against any and all liability, loss, costs, damages, expenses, and attorneys' fees arising or incurred in connection with any such bond or policy heretofore or hereafter procured by the Surety at the instance or inquest [sic] of the Principal [sic] or any of them, and (b) for the performance of every agreement made by the Principals in connection with such bond or policy (including but not limited to Principals Indemnity Agreement in favor of Surety)."

specifically concedes that the transfers were beyond petitioner's control within the meaning of section 1.461–2(c)(1), Income Tax Regs., and that the deposits meet the requirements of section 461(f)(4). Section 461(f) provided as follows during the taxable years in issue:

SEC. 461(f). CONTESTED LIABILITIES.—If—

(1) the taxpayer contests an asserted liability,

(2) the taxpayer transfers money or other property to provide for the satisfaction of the asserted liability,

(3) the contest with respect to the asserted liability exists after the time of the transfer, and

(4) but for the fact that the asserted liability is contested, a deduction would be allowed for the taxable year of the transfer (or for an earlier taxable year),

then the deduction shall be allowed for the taxable year of the transfer * * *

The section of the regulations relevant to our discussion herein is as follows:

Sec. 1.461–2 Timing of deductions in certain cases where asserted liabilities are contested.

(c) *Transfer to provide for the satisfaction of an asserted liability*—(1) *In general*. A taxpayer may provide for the satisfaction of an asserted liability by transferring money or other property beyond his control (i) to the person who is asserting the liability, (ii) to an escrowee or trustee pursuant to a written agreement (among the escrowee or trustee, the taxpayer, and the person who is asserting the liability) that the money or other property be delivered in accordance with the settlement of the contest, or (iii) to an escrowee or trustee pursuant to an order of the United States, any State or political subdivision thereof, or any agency or instrumentality of the foregoing, or a court that the money or other property be delivered in accordance with the settlement of the contest. A taxpayer may also provide for the satisfaction of an asserted liability by transferring money or other property beyond his control to a court with jurisdiction over the contest. Purchasing a bond to guarantee payment of the asserted liability, an entry on the taxpayer's books of account, and a transfer to an account which is within the control of the taxpayer are not transfers to provide for the satisfaction of an asserted liability. In order for money or other property to be beyond the control of a taxpayer, the taxpayer must relinquish all authority over such money or other property.

Respondent argues that, as the transfers in issue were not made directly to the person asserting liability, the deposits herein could qualify for deduction only if they were "to an escrowee or trustee pursuant to a written agreement (among the escrowee or trustee, the taxpayer, and the person who is asserting the liability) that the money or other property be

delivered in accordance with the settlement of the contest." Sec. 1.461–2(c)(1)(ii), Income Tax Regs. Respondent goes on to argue that the transfers herein fail because (1) as none of the various documents referred to above are signed by the persons asserting the liability against petitioner, the various agreements are not "among the escrowee or trustee, the taxpayer, and the person who is asserting the liability," (2) none of the papers satisfy the requirement that money deposited with Seaboard "be delivered [to the person asserting the liability] in accordance with the settlement of the contest," and (3) the deposits do not qualify as transfers "for the satisfaction of an asserted liability." Thus, respondent argues that petitioner is not entitled to the deductions at issue because the deposits were not made to "provide for the satisfaction of the contested liabilities because the transfer of money or other property was not made pursuant to the required written agreement or to an allowable person." Finally, respondent argues that while a transfer deductible under section 461(f) may be to the claimant, or to an escrowee or a trustee, the payments to Seaboard were mere pledges and therefore fail, once again, to qualify for deduction.

Petitioner, on the other hand, makes a variety of arguments and alternative arguments; some ingenious, some not. Thus petitioner argues that section 1.461–2(c)(1), Income Tax Regs., is invalid because "On its face, the regulation is more technical and specific in its requirements than the statute." In the alternative, petitioner argues that, if this Court should find against it on the regulation, the regulation would still be invalid as an impermissible restriction of the scope of section 641(f). Next, petitioner argues that we should apply our opinion in *Poirier & McLane Corp. v. Commissioner*, 63 T.C. 570 (1975), revd. 547 F.2d 161 (2d Cir. 1976), to the facts before us to find the transfers made by it to Seaboard fall within the requirements of section 461(f)(2).[14] Petitioner also argues that the Second Circuit's opinion in *Poirier & McLane* was erroneous because it was actually concerned with principles applicable to section 461(f)(4), i.e., whether the payments made to the trust in that case qualified for deduction under the "all events test" or whether they were merely tax motivated and substanceless transfers. On another

---

[14]At the same time, petitioner argues that the "facts in the instant case are materially different from those in *Poirier & McLane*."

front, petitioner argues that its various agreements with Seaboard established a trust of which Seaboard was trustee, petitioner was settlor, and petitioner's claimants or judgment creditors were beneficiaries. The arrangement between Seaboard and petitioner is a trust, argues petitioner, because the "arrangement is a classic example of a pledge placed in the pledgee's hands as security in the event of default on an obligation." Suffice it to say, and understandably enough, that petitioner makes every possible argument imaginable. To the extent that petitioner makes arguments which are not described above, they will be elucidated if and when relevant.

Our decision in *Poirier & McLane* involved the question of whether the transfer to what has been called a "secret" trust, i.e., a trust formed and funded without the benefit of notice to the trust beneficiaries, was valid where the transfer was, in respect of certain contested claims, against the settlor. In *Poirier & McLane*, the parties presented us with two questions: (1) Whether the transfer therein put the trust corpus beyond the control of the transferor/settlor, and (2) whether the trust instrument was defective because it was not signed by persons asserting liability. We held that the transfer was one which put the trust res beyond the taxpayer's control. We also held that there was no requirement in the regulations that the trust agreement be signed by the claimant. In sum, therefore, we found that, on the facts of that case, there had been a valid "transfer" within the meaning of section 461(f). The Second Circuit disagreed with this ultimate conclusion and we were reversed. *Poirier & McLane Corp. v. Commissioner*, 547 F.2d 161 (2d Cir. 1976).

The *Poirier & McLane* case is, we believe, inapposite. The "control" issue is conceded with respect to the case before us. Respondent's assertion that, in order to qualify as the medium of a valid section 461(f) "transfer," the trust or escrow papers must be actually "signed" by the claimants, has been rejected for good and sufficient reasons by this Court (*Poirier & McLane Corp. v. Commissioner*, 63 T.C. at 579), and possibly by the Second Circuit (*Poirier & McLane Corp. v. Commissioner*, 547 F.2d at 167). We need not here take a second turn around that bush. Finally, and most importantly, however, is that the *Poirier & McLane* case involves radically different facts, and hence, legal principles. It was obvious, both to this Court and the Second

Circuit, that the taxpayer in *Poirier & McLane* actually made a beneficial transfer of funds beyond its control, and that the intent and purpose behind these transfers was to provide for the satisfaction of potentially successful claimants. In *Poirier & McLane* we found that it was the clear intent of the petitioner therein and the trustee that, should the petitioner therein be deemed liable, the very dollars in the trustee's hands would be the ones disbursed to the prevailing claimants. We are not faced with the same unbroken chain in this case. Rather, while Seaboard would have, no doubt, used the funds deposited with it to discharge any liability it might have incurred as surety of petitioner's obligations, neither Seaboard nor petitioner anticipated that this was a likely possibility. Neither Seaboard nor petitioner intended that the dollars petitioner deposited with Seaboard would ever be used to pay a single claim. In fact, they never were so used. The dollars that went to Seaboard, which were admittedly put beyond the control of petitioner and for which it seeks a deduction, were not, and were never intended to be, the same dollars that went to the claimant in settlement of his claim. These latter funds came directly from petitioner and were paid as the result of the independent (from Seaboard) negotiations between petitioner and the claimant.

The purpose of the transfers herein was to make a deposit of collateral with Seaboard with a view to protecting Seaboard against unforeseen loss and thereby inducing Seaboard to file the bonds required of petitioner in order that petitioner could operate in commerce and yet still be, in effect, self-insured. There was no intent that the amounts deposited would ever be paid over to any claimant, regardless of the outcome of any claim against petitioner. All parties anticipated that the deposits would be returned to petitioner upon the settlement of the claim—and all such payments actually were returned to petitioner.[15] Clearly, then, as the payments before us were made to provide for Seaboard's security and *not* "to provide for the satisfaction of the asserted liability," as is required by section 461(f)(2), they are not deductible under section 461(f).

Implied in our conclusion that the payments before us were

---

[15]While Seaboard continued to hold a large amount of deposits after the surety arrangements here at issue were terminated, it is clear that these will be returned when Seaboard no longer perceives any risk of loss out of its contracts with petitioner.

not made to provide for the satisfaction of the asserted liability, and therefore fail the test of section 461(f)(2), is our conclusion that the payments to Seaboard were not paid pursuant to a written agreement that the deposits be paid in accordance with the outcome of the litigation and, therefore, fail to meet that part of the requirements of section 1.461–2(c)(l)(ii), Income Tax Regs. Whether the various agreements between Seaboard and petitioner, and the bonds, are taken individually or as a whole, there is no requirement anywhere in them, either explicit or implicit, that the deposits be delivered in accordance with the outcome of the contest. Rather, it is clear that the various agreements were entered into solely to protect Seaboard, so that petitioner could continue to operate as self-insured. The regulations are a clear and reasonable interpretation of the law and Congress' intent behind it. The regulation states the rule that the payment described in section 461(f) must be transferred under a written agreement "that the money * * * *be delivered* in accordance with the settlement." (Emphasis added.) There is no option implied in the regulation that a contract, like the collateral agreement, will satisfy this requirement. We refuse to create one.

Finally, the parties have pointed out still another reason why the payments to Seaboard are not deductible under section 461(f). The legislative history behind section 461(f) indicates that Congress viewed section 461(f)(2) as authorizing a deduction for payments made to the claimant or to an escrowee. S. Rept. 830 (Part 2), Technical Explanation of the Bill, 88th Cong., 2d Sess. (1964), 1964–1 C.B. (Part 2) 701, 746. The regulations authorized a third type of payment, one to a trust set up like an escrow, i.e., a trust among all the parties thereto. Neither party has raised the argument that the suretyship arrangement before us could qualify as an escrow, and we think it clear that it does not. The question remains, therefore, whether the arrangement qualifies as a trust. Petitioner argues (1) that the arrangment does qualify as a trust, and (2) if it does not qualify as a trust, the regulation is invalid to the extent that it requires a trust arrangement.

We have already described our view of the regulation as a reasonable interpretation of the law which must be upheld. See *Commissioner v. South Texas Lumber Co.*, 333 U.S. 496, 501 (1948). The question, therefore, arises: Is the suretyship arrange-

ment a trust within the meaning of the regulation? We refer once again to section 1.461–2(c)(l)(ii), Income Tax Regs. That paragraph requires (1) a trust, and (2) a written agreement among the taxpayer, trustee, and the "person who is asserting the liability."

Petitioner argues that a trust is present which is a "classic example of a pledge." A trust is clearly not a pledge. A trust has been defined as "a fiduciary relationship with respect to property, subjecting the person by whom the title to property is held to equitable duties to deal with the property for the benefit of another person, which arises as a result of a manifestation of an intention to create it." 1 A. Scott, Trusts, sec. 2.3, pp. 37–38 (3d ed. 1967). A pledge, on the other hand, has been defined as a "security interest in a chattel * * * created by a bailment for the purpose of securing the * * * performance of some other duty." Restatement, Security, sec. 1 (1941). See *In re R & L Engineering Co. v. Commissioner*, 182 F. Supp. 317, 319 (S.D. Cal. 1960). Thus, for example, title does not pass to a pledgee. See *Mount Tivy Winery v. Lewis*, 134 F.2d 120, 124 (9th Cir. 1943). Although a pledge is sometimes spoken of as in the nature of a trust, it is not a trust and has not the legal consequences of a trust. The pledgee does not owe the pledgor the fiduciary duties owing by a trustee to a beneficiary. 1 A. Scott, Trusts, sec. 9, p. 84 (3d ed. 1967).

In pressing its theory upon us that petitioner's deposits of money with Seaboard are a "pledge" of the money and therefore "a trust," petitioner cites us to the case of *Wade v. Markwell & Co.*, 118 Cal. App. 2d 410, 258 P.2d 497 (1953). That case involved the conversion of a mink coat pawned to the corporate defendant. The pledge agreement there in issue, which contract was apparently what might be currently referred to as an "adhesion contract," provided that the pledgee could sell the pledge without notice and at public or private sale. *Wade v. Markwell & Co.*, 258 P.2d at 500. These rights, which were not granted pledgors at common law (258 P.2d at 506), were no doubt a large consideration when the court said:

> Defendant contends that the court's finding that the pledgee's sale was a fictitious proceeding is contrary to the undisputed evidence. It is argued that defendant complied fully with all the technical requirements of the law in selling plaintiff's coat at "public auction, in the manner and upon the notice of sale of personal property under execution" as prescribed in the applicable statutes. Yet however much there may be external, literal compliance with the

formalities of the law, and however comprehensive may be the power of sale vested in a pledgee, the circumstances attending such a sale are subject to strictest scrutiny by the courts. For the relation between pledgor and pledgee, wherein the latter is empowered to sell a pledge placed in his hands as security for a debt in the event of default, is in the nature of a trust. Occupying a status akin to that of a fiduciary, and being accorded by the code powers in derogation of the common law such as the right himself to become a purchaser at a sale wherein the pledge may be disposed of without notice to the debtor, if so agreed upon, there is all the more reason why the pledgee is held to the utmost good faith in his transactions both with the pledged property and the pledgor. Though the pledgor has waived virtually all the protection afforded him at common law, he has not waived the right to have his collateral sold at an honest sale to the highest bidder. For it has been held that even where a contract waives notice and permits a sale to himself, the pledgee is still a " 'trustee to sell,' not to buy, though with the privilege of buying, if fairly sold." [Citations omitted.]

In the same vein, and perhaps a better case for petitioner, is the case of *Ferro v. Citizens National Trust & Savings Bank*, 44 Cal. 2d 401, 282 P.2d 849 (1955). There, the court dealt with an action for damages against a bank which had mishandled the proceeds of insurance on wine which had been destroyed by fire. There, the Supreme Court of California said at pages 852–853:

Ferro pledged the warehouse receipts for his wine as collateral security for the payment of his debt to defendant. A pledgee of collateral security for the payment of a debt is a trustee of the pledgor. After the wine was destroyed, the insurance proceeds took the place of the wine and when those proceeds came into defendant's possession they likewise became subject to the trust established by the pledge. Defendant could properly apply those proceeds to discharge the obligation secured by the pledge, but upon satisfaction thereof, it was obliged to return any surplus that remained to the pledgor, Ferro. Its failure to do so was a breach of trust. [Citations omitted.]

We believe that the California Court of Appeal in *Wade v. Markwell & Co., supra,* used the word "trust," not in the technical sense, but to emphasize the fiduciary duties which had been violated in the case before it. By the same token, the *Ferro* court did not, we believe, intend to create a new type of trust/pledge, thereby confusing those two concepts. Rather, again, it spoke loosely when it referred to "trusts." These cases do not, therefore, help petitioner in its quest to render water into wine. On the other hand, if the rule in California is that a "pledgee of collateral security * * * is a trustee to the pledgor" then, again, petitioner must fail because the pledgor in such a case must occupy both the status of settlor and of beneficiary— as opposed to the regulations' requirement of transfer for the

benefit of claimant. See Cal. Com. Code secs. 1201(37), 9305 (West).

With respect to the second requirement of the regulations, i.e., for a written agreement between the taxpayer, trustee, and the person asserting the liability, we have already concluded that petitioner's claimants were not at all involved in the suretyship arrangement. The beneficiary of the indemnity and collateral agreements was Seaboard, not petitioner's claimants. In sum, petitioner has confused its relations with Seaboard. Petitioner stood in two disparate capacities with respect to Seaboard. It was the principal in a suretyship relationship between itself and Seaboard. To induce Seaboard to undertake this obligation, it also was a pledgor of collateral to Seaboard. Petitioner never parted with ownership of the transferred sums, just their possession. It reported the income earned thereon and treated the amounts paid as prepaid expenses. While Seaboard clearly had certain fiduciary obligations toward petitioner, these obligations did not constitute trust obligations. As no trust was present, the arrangement before us fails the requirements of the regulations that a trust be used.[16]

*Decision will be entered under Rule 155.*

---

[16]Here, we note in passing that, while petitioner stipulated that the "amounts petitioner transferred to Seaboard as 'deposits' pursuant to the March 1, 1961 agreement were equal to the *full amount* of petitioner's estimated liability to third parties," we have interpreted these stipulations, beneficially for petitioner, to mean "full amount up to Seaboard's liability limits."