OREGON TRAIL MUSHROOM COMPANY, PAUL H. RUTTEN, TAX MATTERS PARTNER, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Oregon Trail Mushroom Co. v. Commissioner
Docket No. 5657-89
United States Tax Court
T.C. Memo 1992-293; 1992 Tax Ct. Memo LEXIS 317; 63 T.C.M. (CCH) 3045; May 19, 1992, Filed *317 Decision will be entered under Rule 155. O, which operates a large commercial mushroom production facility, claimed an investment tax credit in 1984 for its entire facility. The Commissioner allowed the credit in full for some of the assets in 1984, allowed the credit as to other assets partly in 1984 and the remainder in 1985, and disallowed the credit altogether as to other assets. She disallowed the credit in full on certain assets because they were not "section 38 property". O also claimed an energy tax credit with respect to certain assets which utilized geothermal energy available on site. The Commissioner disallowed some of this credit. The Commissioner disallowed certain deductions claimed by O for legal and accounting expenses in its first year of operation. 1. Held, some of the assets for which the Commissioner disallowed the investment tax credit are sec. 38 property because they are part of a single purpose horticultural structure or because they qualify as tangible property used as an integral part of manufacturing or production. 2. Held, further, the Commissioner erroneously disallowed the energy tax credit on some of O's assets because those assets use *318 or distribute geothermal energy. 3. Held, further, O is not entitled to deduct legal and accounting expenses in the year those expenses were incurred, but must add those expenses to the cost of its facility and amortize the expenses over the life of the facility. Commissioner v. Idaho Power Co., 418 U.S. 1 (1974). James H. Stethem, James A. Comodeca, and Michael R. Nelson, for petitioner. Tim A. Tarter and Randall G. Durfee, for respondent. GOFFE
GOFFE
MEMORANDUM FINDINGS OF FACT AND OPINION GOFFE, Judge: The Commissioner proposed adjustments to partnership items of Oregon Trail Mushroom Co. (OTM) pursuant to the partnership audit and litigation procedures of sections 6221-6233 with respect to taxable years 1984 and 1985. The proposed adjustments are as follows: Partnership Item
1984
1985
Depreciation
$ 248,767
$ 178,340 Start-up expenditures
110,634
(4,834)
Investment tax credit
3,013,022
(1,708,109)
Energy tax credit
3,335,009
1,026,917 Investment tax credit recapture
166,220 Energy tax credit recapture
76,500 The petition herein was filed by Paul H. Rutten, tax matters partner, hereinafter referred to as petitioner. *319 After concessions, the issues presented for our decision are: (1) Whether OTM is entitled to an investment tax credit for certain assets used in the commercial production of mushrooms; (2) whether OTM is entitled to an energy tax credit for certain assets used at its mushroom producing facility; (3) in what year were the assets placed in service, as defined in section 46; and (4) whether OTM is entitled to a deduction in 1984 for legal and accounting expenses, or whether those expenses must be amortized over a longer period. Unless otherwise indicated, all section references are to the Internal Revenue Code for the years at issue. All Rule references are to the Tax Court Rules of Practice and Procedure. FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. The stipulation of facts and attached exhibits are incorporated herein by this reference. OTM is an Oregon limited partnership located in Vale, Oregon. It files its partnership returns (Forms 1065) on a calendar year basis and began the operation of an active trade or business on May 1, 1984. OTM is a state-of-the-art mushroom growing facility designed to yield 3,150,000 pounds of mushrooms *320 annually. It began construction of its mushroom facility in 1984. By the end of 1984, two of the grow rooms were planted and harvested. By December 1985, construction of all phases of the facility was complete. OTM utilizes a six-step process modeled after the Dutch tunnel system, a system designed to provide a consistently high yield of mushrooms. The process may be summarized as follows: First, the compost is prepared at the mix and storage site by use of a special compost recipe consisting mainly of chicken manure and straw. The chemical balance of the compost is critical in providing the proper growing medium for mushrooms. The mix and storage site is approximately 5 miles from the main facility at Vale, Oregon. The compost is then transported to the compost wharf located at the main facility. At the compost wharf, the compost is allowed to grow bacteria under controlled conditions so as to be suitable for mushroom growing. After the compost has developed the proper amounts of bacteria in the compost wharf, it is placed in a pasteurizing structure to kill foreign pathogens. This is accomplished in tunnels where filtered geothermally heated air is injected into the tunnels *321 for approximately 10 to 12 hours. The compost is then removed from the tunnel units and mushroom spawn are sprinkled in the compost. The compost and spawn are then transported by overhead conveyor to one of 40 grow rooms enclosed within a single growing structure. The grow rooms are pressurized, airtight enclosures which are computer monitored in order to maintain the proper ambient air temperature, humidity, and carbon dioxide levels. Once the compost and spawn mixture is in the grow room, it is placed on specially designed mushroom grow racks and encased with peat moss. The mushrooms are then allowed to grow in these grow rooms under controlled conditions. After the mushrooms have grown to the desired size, they are harvested by hand, sorted, packaged, and then shipped to OTM's customers. The compost and spawn mixture remains on the grow racks for four to six more weeks to allow for the harvesting of three or four additional crops. Each grow room is expected to produce five to six crops per year. The first mushrooms planted by OTM in 1984 utilized compost and spawn from a similar mushroom facility, Treasure Valley Mushrooms. Treasure Valley Mushrooms was a pilot project *322 for OTM and used the same technology as OTM, but on a smaller scale. The mix and storage site, where the compost is initially mixed, includes a roofed storage bin which is used to keep the compost mixture dry, water wells, fencing, pumps, storage tanks, and several paved surfaces, including the mixing pad, the turnaround pad, straw storage area, and bale storage area. The primary function of the mix and storage site is to store the compost materials. OTM claimed an investment tax credit (ITC) for the entire mix and storage site. The Commissioner allowed the credit for the paved surface area, but disallowed the credit for the remainder of the mix and storage site. The compost wharf, where the compost is allowed to grow bacteria under controlled conditions so as to be suitable for mushroom growing, consists of a metal frame structure with a concrete foundation and floor. The structure is necessary to protect the compost from the severe cold weather. The concrete floor is sloped to allow for drainage. It contains a heating, ventilation, and air conditioning (HVAC) system to control the heat and humidity in the compost wharf. The HVAC systems in the compost wharf and throughout *323 the facility consist of a coil through which geothermally heated water passes, and fans which blow the heat from the coil into the area of the facility requiring heat. The compost wharf was specifically designed for the commercial production of mushrooms. It has insulated walls, with plywood placed above the floor to prevent compost buildup on the sides of the walls. Its beams are made of galvanized steel, and it contains enough space to allow workers to turn and properly maintain the mixture. The floor of the compost wharf contains a forced air system which allows the distribution of hot air under the compost. The compost wharf was not used until 1985. It was used exclusively in the commercial production of mushrooms. The pasteurization tunnel unit, where the compost is pasteurized to kill foreign pathogens, consists of a metal frame structure with three tunnel units and was specifically designed for the commercial production of mushrooms. The metal frame structure provides workspace for transporting and monitoring the compost and it protects the tunnel units from the elements which would impede the pasteurization process. The metal frame structure was constructed with hot *324 dipped galvanized steel beams. The pasteurization unit was exclusively used in the commercial production of mushrooms. The pasteurization unit, its tunnels, and its HVAC's were first placed in service in 1984. The grow unit, which houses 40 individual grow rooms, is where the mushrooms are allowed to grow until harvesting. Each grow room is equipped with an HVAC and two grow racks. The HVAC's distribute geothermal energy through the grow rooms and the grow racks are equipped with metal piping designed to distribute geothermal energy. However, the piping was never used. The grow rooms are specially designed airtight rooms where the temperature, humidity, and carbon dioxide levels are controlled by computer to maximize mushroom production. The cement floors are slanted for drainage. The metal frame structure housing the grow rooms is painted with a zinc chromate primer with 4-mil thickness and is insulated to maintain the proper temperature for growing mushrooms. The grow unit was specifically designed for, and exclusively used in, the commercial production of mushrooms, and all of the activities in the unit were to that end. The 40 grow rooms were completed by the end of *325 1984. Only two of the grow rooms, including their grow racks and HVAC's, were placed in service in 1984; the remainder of the grow rooms were placed in service in 1985. The waste water and sewage system is used to dispose of unwanted water from the geothermal wells, restrooms, and drinking fountains. OTM erected a chain link fence which partially encircles the main facility except that portion bounded by a river. The fence was erected to protect the facility from thieves, vandals, and stray animals. Adjacent to the compost wharf is the mechanical unit which encloses the heat exchanger and tanks, two boilers, and a geothermally powered chiller. OTM chose Vale, Oregon, to build its facility because of the availability of geothermal energy at the site. The mushroom facility utilizes hot water from a geothermal reservoir having a temperature exceeding 50 degrees Celsius. OTM does not convert any geothermal energy into electricity. Rather, the mushroom facility utilizes geothermal energy in conjunction with electricity and propane to maintain critical air temperature and humidity requirements within the mushroom facility. Of all the energy utilized by the plant, 81.9 percent *326 is derived from geothermal energy. Geothermal water is pumped from a well to a heat exchanger, where the heat is transferred to distilled water and geothermal water itself is also routed through the chiller. The geothermal water is then injected into the ground. Because of the corrosive nature of the geothermal water it is not feasible to circulate it through the plant; therefore, by means of the heat exchanger, the heat is transferred to distilled water which is circulated throughout the plant. The facility utilizes geothermal energy in the compost wharf, which has heating coils and pipes that run through the floor; the pasteurization tunnels, which use geothermal energy to pasteurize the compost mixture; the pasteurization unit, which employs geothermal energy to provide a constant temperature within the structure; and the grow racks, which utilize geothermal energy to foster the growth of the mushrooms. OTM incurred start-up expenses of $ 744,592, which it elected to amortize over a 60-month period under sections 709 and 195. OTM also incurred legal and accounting expenses of $ 24,168 after its May 1, 1984, starting date. These expenses were incurred in connection with the *327 construction and initial operation of the Vale facility. OTM claimed the entire cost of the compost wharf as investment in property qualifying for an ITC. The Commissioner allowed only the cost of the HVAC system and the forced air system as an investment in property qualifying for an ITC. OTM claimed an ITC on the entire pasteurization unit. The Commissioner denied the credit for the structure and only allowed a credit on 33 percent of the cost of the tunnels in 1984, while allowing the remaining 67 percent in 1985. The Commissioner disallowed the cost of the metal framed structure which encloses the 40 grow rooms as an investment in property not qualifying for an ITC. Since only two of the grow rooms were planted by the end of 1984, the Commissioner determined that only 5 percent (2 of 40) of the grow rooms were property eligible for an ITC in 1984. The remaining cost of the other grow rooms was allowed as an investment in property qualifying for an ITC in 1985. Likewise, the Commissioner allowed only 5 percent of the cost of the grow racks in 1984 as property eligible for the ITC, and allowed the other 95 percent of the total costs of the grow racks in 1985. OTM claimed *328 ITC's of $ 240,081 in 1984 and $ 489,837 in 1985 for the HVAC's in the grow rooms. The Commissioner disallowed all but 5 percent of the total cost of the HVAC's for 1984 and allowed the remaining 95 percent of the total cost in 1985. OTM claimed ITC's in the amount of $ 23,965 in 1984 and $ 41,509 in 1985 for the HVAC in the three tunnel rooms. Respondent concedes 33 percent of the total costs in 1984 and the other 67 percent in 1985. OTM also claimed an ITC for costs incurred in the construction of a truck roadway which encircles the mushroom plant. The Commissioner allowed approximately 10 percent of those costs for 1984 and 1985. OTM claimed the entire cost of the waste water and sewage system as property qualifying for an ITC. The Commissioner disallowed the portion of the cost of the waste water and sewage system allocable to the restrooms and drinking fountains. The Commissioner also denied an ITC that OTM claimed for the fence which was erected around the perimeter of the main Vale, Oregon, facility. OTM claimed an ITC for the structure, foundation and miscellaneous other costs of the mechanical unit. The Commissioner disallowed the ITC taken except for the amount *329 allocable to "other costs". Because of its use of geothermal energy, OTM claimed the entire cost of the following assets as property qualifying for an energy tax credit (ETC): For 1984
Asset
Cost
Compost wharf
$   424,745
Tunnel unit
379,552
Grow unit
2,085,899
Sewage system
106,328
HVAC-grow rooms
240,081
HVAC-tunnel rooms
23,965
Grow racks
74,439
Total
$ 3,335,009
For 1985
Asset
Cost
HVAC-grow rooms
$ 489,837
HVAC-tunnel rooms
41,509
Grow racks
368,035
Addl. heating coils
10,598
Grow structure modification
49,098
Compost wharf modification
11,841
Ref. equipment
14,423
Isoloc cooler
35,089
Cooling tower
15,228
Chiller
65,865
Total
$ 1,101,523
The Commissioner allowed 92 percent of the cooling tower and chiller costs (i.e., 92 percent of $ 81,093, or $ 74,606) as property qualifying for an ETC. She also allowed 100 percent of the cost of the following assets which OTM claimed as property qualifying for an ETC: 1984
1985
Geothermal costs
$ 891,819
$ 54,109
Geothermal equipment
23,856
9,148
Total
$ 915,675
$ 63,257
The Commissioner disallowed the cost of all other assets, determining *330 that those assets were property not qualifying for an ETC. OTM deducted the $ 24,168 of initial accounting and legal fees in 1984 as ordinary and necessary business expenses. The Commissioner determined that these expenses should be treated as start-up expenses and, thus, should have been amortized over a 60-month period beginning May 1, 1984. OPINION It is worth noting before proceeding further that the provisions of section 48 (relating to the investment tax credit and the energy tax credit) applicable to 1984 and 1985, the years in question, were struck out by the Omnibus Budget Reconciliation Act of 1990, Pub. L. 101-508, section 11813(a), 104 Stat. 1388-536, which amended section 48, now entitled Energy Credit; Reforestation Credit. First, we examine whether the assets qualify for the ITC, then whether they qualify for the ETC, and then, if qualified, we decide which year the assets should be deemed placed in service in order to decide the extent of the credit allowable for each year. Finally, we decide whether legal and accounting expenses which OTM deducted in 1984 are allowable in the year they were incurred or must be amortized. In his petition, petitioner alleged *331 that the Commissioner improperly issued two FPAA's in violation of the TEFRA partnership procedures of sections 6221-6233. Petitioner did not argue that issue on brief and it is, therefore, deemed to be conceded. Remuzzi v. Commissioner, T.C. Memo. 1988-8, affd. without published opinion 867 F.2d 609 (4th Cir. 1989). The Commissioner also partially disallowed depreciation expenses. The parties disagree as to the useful life of certain assets on which depreciation was claimed. The parties agree that the cost basis of the property (or, where appropriate, a portion thereof) held to be part of a single purpose horticultural structure qualifying for an ITC should be depreciated over a 5-year life, while depreciable assets that are determined not to be part of a single purpose horticultural structure should be depreciated over an 18-year life. I. Investment Tax Credit
The Commissioner disallowed an ITC for the structures which house the grow unit, the pasteurization unit, the compost wharf, the mix and storage site, and the mechanical unit. She also disallowed an ITC on portions of the waste water and sewage system, fences, and truck roadways. *332 Respondent's determinations are presumed correct. Rule 142(a). Whether OTM is entitled to an ITC depends on whether any of the property may be characterized as "section 38 property" which is eligible for credit against Federal income tax. Section 38 allows a credit equal to 10 percent of the value of section 38 property. See sec. 46(a) and (b)(1). Section 48(a), in defining section 38 property, provides: (1) In General. -- Except as provided in this subsection, the term "section 38 property" means -- (A) tangible personal property (other than an air conditioning or heating unit), or (B) other tangible property (not including a building and its structural components) * * * * * * (D) single purpose agricultural or horticultural structures * * *
Thus, in order for OTM to be able to take an ITC on its various assets, the assets must be either tangible personal property, other tangible property, or part of a single purpose agricultural or horticultural structure. A. Single Purpose Horticultural Structure
Section 48(p)(3) defines "single purpose horticultural structure" as: (A) a greenhouse specifically designed, constructed, and used for the commercial *333 production of plants, and (B) a structure specifically designed, constructed and used for the commercial production of mushrooms. [Emphasis added.]
Petitioner argues that all of the assets of OTM are eligible for an ITC because they are part of a single purpose horticultural structure. Respondent, on the other hand, argues that only the grow rooms are used in growing mushrooms and are, thus, the only assets that fall under the definition of single purpose horticultural structure. The rest of the assets must then fall under one of the more general definitions of section 38 property. Hence, argues respondent, to determine whether the assets involved in this case are entitled to an ITC we must first determine which, if any, assets are part of a single purpose horticultural structure. The regulations list a series of tests which an asset or structure must satisfy before it can be considered part of a single purpose horticultural structure. We will first discuss each of the tests, and then apply those tests to each asset. Section 1.48-10(c), Income Tax Regs., sets out the requirements which a structure must meet to qualify as a single purpose horticultural structure. It *334 must be: (1) A greenhouse or other structure; (2) "specifically designed and constructed" in the manner described in section 1.48-10(d), Income Tax Regs.; (3) for "permissible purposes" as defined in section 1.48-10(c)(2), Income Tax Regs.; and (4) "specifically used", as defined in section 1.48-10(e), Income Tax Regs.
There is no dispute as to whether the structures housing the assets involved satisfy the first test of the above regulation; it is agreed that the structures qualify as "other structures". As for the second requirement, section 1.48-10(d), Income Tax Regs., provides: (d) Specifically designed and constructed. A structure is specifically designed and constructed if it is not economic to design and construct the structure for the intended qualifying purpose and then use the structure for a different purpose. * * *
The third requirement, that the structure be for "permissible purposes", is defined in section 1.48-10(c)(2), Income Tax Regs., and includes the commercial production of mushrooms. Finally, the structure must be "specifically used" under the tests contained in section 1.48-10(e), Income Tax Regs. There are two parts to the test: the exclusive use *335 test and the actual use test. The Exclusive Use Test
The structure must be exclusively used for a permitted purpose, in this case the commercial production of mushrooms. This means that the structure cannot be used to process or market the product and can only be used to store materials such as feed if the storage is "incidental" to the permitted purpose. A storage function will be presumed not to be incidental if more than one-third of the structure is devoted to storage. Sec. 1.48-10(e)(1)(iii), Income Tax Regs.
The Actual Use Test
Under this test, not only must a structure be designed and constructed for a permissible purpose, it must also be used for that purpose in the given year. This is basically the same as requiring the structure be put in service for the year at issue. Sec. 1.48-10(e)(2), Income Tax Regs. Because the "actual use" test is similar to the issue of what year the assets in this case were put in service, we will decide whether the actual use test has been met when we discuss the "placed in service" issue. Thus, an asset meeting all of the other requirements will be available for the ITC in the year the asset was placed in service. In applying *336 the regulations to the assets in the instant case we first examine the grow unit. Respondent disallowed an ITC for the structure surrounding the grow rooms. The structure that houses the 40 grow rooms is a metal frame structure painted with zinc chromate primer, having specially placed columns to accommodate the equipment and grow rooms; it is insulated to maintain the correct temperature and humidity; and its floor is slanted to allow for drainage. Because of its unique features tailored to the specific needs of the mushroom growing process, we hold that this structure satisfies the requirement that the structure be specifically designed and constructed for the production of mushrooms. The grow unit structure also satisfies the third requirement, the permissible purpose requirement: the grow unit is used to produce mushrooms, and all of the activities, from maintaining the units to harvesting the mushrooms, are to that end. Since all of the activity in the grow unit was for the commercial production of mushrooms, the structure was exclusively used for the production of mushrooms, thus satisfying the last requirement -- the exclusive use test. Therefore, OTM is entitled to take *337 an ITC for the grow unit structure. Next we consider the pasteurization unit. The Commissioner disallowed an ITC for the structure surrounding the three pasteurization tunnels. We disagree, and hold that OTM is entitled to an ITC for the pasteurization unit building. The structure was specifically designed and constructed for the growing of mushrooms. Without the pasteurization of the compost, the mushroom growth would be seriously inhibited by competing with unrelated organisms. The function of pasteurization is to kill all organisms so that only mushrooms will grow. The structure over the pasteurization tunnels is necessary to protect the tunnels from the harsh and changing weather conditions of Vale. The structure is made with hot dipped galvanized steel beams, and the floors are specially designed to accommodate pressure requirements. Accordingly, we hold that the pasteurization unit structure was specifically designed and built for the production of mushrooms. We next must decide whether the pasteurization unit passes the permissible purpose test. Respondent argues that mushroom production only occurs in the grow rooms and that the activity in the pasteurization unit *338 fails to satisfy the permissible purpose test. She argues that mushroom growing is the only permissible purpose in this case, and pasteurization of compost is not within that definition. Respondent takes too narrow of a view of the definition of mushroom production. Section 48(p) defines "single purpose horticultural structure" to include those structures used in the commercial production of mushrooms. Nowhere does that definition state that the ITC should be limited to the structures where the mushrooms actually grow. OTM was designed to be a state-of-the-art facility producing a consistently high yield of mushrooms. No step in the process is unnecessary, and to eliminate one would reduce or destroy the mushroom crop. Therefore, we hold that the pasteurization unit was used in the production of mushrooms and satisfies the permissible purpose requirement. We must next determine whether the pasteurization unit was exclusively used for the production of mushrooms. The activities in the pasteurization unit include the pasteurization of the compost and the operation and maintenance of the tunnel units. Therefore, the pasteurization unit is used exclusively for the production *339 of mushrooms. Since the pasteurization unit has met all of the tests, OTM is entitled to an ITC for that structure. Next we consider the compost wharf. The compost wharf was specifically designed and constructed for the mixture and fermentation of compost, a necessary first step in the raising of mushrooms. Its beams are made of galvanized steel to protect it from the corrosive effects of the compost. Likewise, the lower portions of the walls are covered with plywood to protect them from the compost. The concrete floor is slanted to allow for drainage. OTM designed and built this structure with the preparation of compost in mind. It is not, as respondent argues, merely a generic structure that OTM decided to use for the preparation of compost. As to the permissible purpose requirement, respondent argues that the compost wharf is not used for a permissible purpose since the preparation of compost and the growth of bacteria is not a permissible purpose. As we held with regard to the pasteurization unit, since the proper fermentation of the compost is a necessary component in the production of mushrooms, the compost wharf is used for a permissible purpose within the meaning *340 of section 1.48-10, Income Tax Regs. Since the compost wharf is used exclusively for that purpose it also passes the exclusive use test. Accordingly, OTM is entitled to an ITC for the compost wharf in the year that it was placed in service. For the mix and storage site, the Commissioner allowed an ITC only for certain paved surfaces. We agree with that determination and hold that the mix and storage site is not part of a single purpose horticultural structure. The mix and storage site was not specifically designed with special features, but is merely a structure which houses a large concrete slab that is used to store and mix the straw, manure, and chemicals. Petitioner has failed to show that OTM could not economically adapt the mix and storage site to another purpose, and it therefore does not meet the "specifically designed and constructed" requirement of section 1.48-10(d), Income Tax Regs. Thus, we sustain respondent's determination as to the mix and storage site. The Commissioner disallowed an ITC for the structure and foundation of the mechanical unit. Petitioner argues that this determination was erroneous in that the mechanical unit, which houses the equipment that *341 heats the buildings, is part of the single purpose horticultural structure. While petitioner may be correct that the mechanical unit is used in the production of mushrooms, he has failed to show that the mechanical unit structure is not economically adaptable to another use. The mechanical unit is used to convert the geothermal energy and to heat the other parts of the facility. If the facility were to be converted to a warehouse, for example, the mechanical unit would be equally useful in heating a warehouse. Thus, petitioner has failed to show that the mechanical unit could not be economically converted for a use other than the production of mushrooms. This reasoning can also be applied to the disallowed portion of the sewage system and the roadway. Therefore, we hold that OTM is not entitled to an ITC on the mechanical unit, the disallowed portion of the sewage system, or the roadway. Respondent argues in support of the disallowance of ITC's for the various structures involved that the structures are economically adaptable to other uses and, thus, they fail the specifically designed and constructed requirement. An example in the regulations provides a different interpretation: *342 A constructs a rectangular structure for use as an egg-producing facility. The structure has no windows. The walls and roof are made of corrugated steel and there is a door which is 4 feet wide and 8 feet tall at each end of the structure. At the end of each wall are louvered openings approximately 4 feet high and 8 feet long. These openings house thermostatically controlled fans. In the center of the walls are manually operated fresh-air openings. Corrugated steel "curtains" hang from the top of the openings so that the openings can be completely closed in cold weather, but the curtains can be propped open to admit fresh air. The building is well insulated. A has reinforced the roof with extra trusses and rafters and reinforced the buildings with extra wall studs. Two rows of cages are suspended from the rafters by thin steel girders and wires. The floor of the structure is a sloping concrete slab pierced with long troughs which run the length of the structure beneath the cages. The troughs are used for collection and disposal of chicken wastes. When this structure is placed in service it will qualify for an investment credit under this section. [Sec. 1.48-10(j), *343 Example (1), Income Tax Regs.]
This example illustrates that a facility which is specially built for an agricultural or horticultural process, with features that are unique to that process, and one that is used exclusively for that process, is entitled to an ITC under the definition of single purpose horticultural system. OTM's facility, with its specially designed and constructed buildings, serves one purpose, the commercial production of mushrooms. We think respondent adopted an unreasonable interpretation of the regulations in this case. The type of facility OTM constructed at Vale, Oregon, is within the ambit of the example quoted above. It is also within the definition set by Congress, when it stated "for the commercial production of mushrooms." The Senate Finance Committee, in enacting the applicable version of section 48, stated in its report: When the investment tax credit was restored in 1971 it was the intention of the committee, as expressed in its report on the Revenue Act of 1971, to make it clear that the credit as restored was to apply to special purpose agricultural structures. Despite this expression of intent, the Internal Revenue Service has *344 denied the credit to special purpose agricultural structures and enclosures used for raising poultry, livestock, horticultural products or for producing eggs. Taxpayers' litigation to establish their right to these credits is both expensive and troublesome, particularly in cases involving small farmers with limited amounts of eligible property. As a result of this continuing controversy, the committee has decided to specifically provide that these agricultural structures are eligible for investment credit. [S. Rept. 95-1263 (1978), 1978-3 C.B. (Vol. 1) 414.]
We think Congress intended a broad application of the ITC to agricultural and horticultural structures, and the Commissioner's continuing resistance in this area frustrates clear congressional policy. B. Other Tangible Property
Petitioner argues that if we decide that certain property does not qualify for an ITC because it is not part of a single purpose horticultural structure, we should find that it is still eligible for an ITC because it is "other tangible property". Because we have held that the structures housing the compost wharf, pasteurization unit, and grow unit are part of a single *345 purpose horticultural structure, we need not consider whether they meet the definitions of other tangible property. However, since we have also held that the mix and storage site and mechanical unit were not part of a single purpose horticultural structure, we must examine whether they qualify as "other tangible property". As indicated, section 48(a) in defining section 38 property provides: (1) In General. -- Except as provided in this subsection, the term "section 38 property" means -- * * * (B) other tangible property (not including a building and its structural components) but only if such property -- (i) is used as an integral part of manufacturing, production or extraction * * *
Thus, in order for the mix and storage site structure and the mechanical unit structure to be "other tangible property", they must not be a building and they must be an integral part of manufacturing or production. Elaborating on the requirement that the asset not be a building, section 1.48-1(e), Income Tax Regs., defines "building" as: (1) Generally buildings and structural components thereof do not qualify as section 38 property. * * * The term "building" generally means any *346 structure or edifice enclosing a space within its walls, and usually covered by a roof, the purpose of which is, for example, to provide shelter or housing, or to provide working, office, parking, display, or sales space. The term includes, for example, structures such as apartment houses, factory and office buildings, warehouses, barns, * * *
The regulation defines "building" in terms of two tests: the appearance test and the functional test. The appearance test has its genesis in the portion of section 1.48-1(e)(1), Income Tax Regs., which provides that a building "generally means any structure or edifice enclosing a space within its walls, and usually covered by a roof". The functional test inquires into whether the purpose of the structure at issue is of the same nature as the purpose described by example in the regulations. Consolidated Freightways, Inc. v. Commissioner, 708 F.2d 1385, 1388 (9th Cir. 1983), affg. on this issue and revg. in part 74 T.C. 768 (1980). The regulations provide that the function or purpose of a building is "to provide shelter or housing, or to provide working, office, parking, display, or sales space", or *347 to provide a similar function. Munford, Inc. v. Commissioner, 87 T.C. 463, 479 (1986), affd. 849 F.2d 1398 (11th Cir. 1988); sec. 1.48-1(e)(1), Income Tax Regs. The Court of Appeals for the Ninth Circuit, to which this case is appealable, has rejected the appearance test in favor of the functional test. Consolidated Freightways, Inc. v. Commissioner, supra at 1387. In the instant case, the function of the mix and storage site was essentially to store the compost materials, individually and as a mixture. We think that the mix and storage site functions as a warehouse or barn, and is thus within the explicitly enumerated examples of "building". Having come within the definition of building, it cannot qualify as other tangible property. Petitioner argues that the mechanical unit is not a building under the above regulation because it merely houses equipment. Section 1.48-1(e)(1), Income Tax Regs., does provide that the term building does not include "a structure which is essentially an item of machinery or equipment". However, a structure is not outside the definition of building because it houses items of machinery. *348 Under the exception set forth in the regulation, a structure will not be considered a building only if it is an item of machinery or equipment. In this case, the mechanical unit is not an item of machinery such as a furnace or oven. Rather, it is more like a barn or warehouse because it houses equipment used by the facility. Therefore, we hold petitioner's argument that the mechanical unit is essentially an item of machinery or equipment unpersuasive and hold that the mechanical unit is within the definition of building. As such, it cannot qualify as other tangible property. OTM erected a chain link fence on its property. Petitioner argues that the fence is an integral part of the production of mushrooms because it keeps vandals and animals out of the facility and is, thus, within the definition of other tangible property. We have held previously that fences erected to deter theft are an integral part of manufacturing and production and therefore qualify for an ITC as other tangible property. Consolidated Freightways Inc. v. Commissioner, 74 T.C. 768, 799 (1980), affd. in part and revd. in part on another issue 708 F.2d 1385 (9th Cir. 1983); *349 Spalding v. Commissioner, 66 T.C. 1017 (1976). In the instant case, the fence was erected to protect the facility from thieves, vandals, and stray animals which could damage the facility and the mushroom crop. Therefore, we hold that the chain link fence is property used as an integral part of manufacturing or production and thus qualifies as other tangible property. However, as to the portion of the water and sewage system that the Commissioner disallowed, we hold that those assets are not an integral part of OTM's mushroom facility. The disallowed portion of the water and sewage system pertains only to employee use and is only incidental to production and manufacturing; therefore, those assets are not an integral part of manufacturing or production and OTM is not entitled to an ITC for those assets. The Commissioner disallowed part of the costs related to the roadway surfaces. Petitioner did not offer sufficient evidence to show that this determination was incorrect, and thus has not met his burden of proof on that issue. II. Energy Tax Credit
OTM claimed an energy tax credit (ETC) for nearly all of its assets in 1984 and 1985 because it utilizes *350 geothermal energy at its Vale, Oregon, site. The Commissioner, in the FPAA, partially allowed the costs as basis in property qualifying for an ETC as follows: 1984
1985
Basis of property claimed for ETC
$ 3,335,009
$ 1,101,523
Basis of property allowed for ETC
0
74,606
The Commissioner also allowed the following costs which OTM claimed as basis in property qualifying for an ETC: Asset
1984
1985
Geothermal costs
$ 891,819
$ 54,109
Geothermal equipment
23,856
9,148
Total
$ 915,675
$ 63,257
(Geothermal costs include the following: source wells, transfer mechanical, injection wells, geological and testing, and engineering expenses.)
OTM utilizes geothermal energy by distributing heat through metal pipes in the floor in its compost wharf. Geothermal energy is used in the pasteurization unit, both in the unit itself to provide heat for workers and to maintain a constant temperature for the tunnels, and also in the tunnels to pasteurize the compost mixture. The grow rooms utilize geothermal energy in maintaining the proper atmosphere for mushroom growing. Section 38, in addition to allowing an investment tax credit, also allows an ETC *351 on "energy property". Section 48(1) defines energy property as property which is, among other things, equipment used to produce, distribute, or use energy derived from a geothermal deposit. Sec. 48(1)(3)(A)(viii). For purposes of the ETC, all property which otherwise meets the definition of energy property is treated as meeting the requirements for section 38 property. Thus, buildings and structures which would otherwise not be eligible for the investment tax credit under section 38 are eligible for the ETC. Sec. 48(l)(1). The regulations under section 48 further define geothermal equipment. The regulations echo the statutory definition in providing that it is equipment that "produces, distributes, or uses energy derived from a geothermal deposit". Sec. 1.48-9(c)(10), Income Tax Regs. Geothermal production equipment is defined as "equipment necessary to bring geothermal energy from the subterranean deposit to the surface". Distribution equipment is defined as "equipment that transports geothermal steam or hot water from a geothermal deposit to the site of ultimate use." Finally, geothermal equipment includes equipment that "uses energy derived both from a geothermal deposit *352 and from sources other than a geothermal deposit", as long as the use of energy from sources other than geothermal sources does not exceed 25 percent, and only to the extent of the geothermal energy used. Sec. 1.48-9(c)(10)(ii)-(iv), Income Tax Regs.
The regulations do not define in detail what "equipment that uses geothermal energy" means. However, examples in the regulations provide some guidance: Example (1). On October 1, 1979, corporation X * * * places in service a system which heats its office building by circulating hot water heated by energy derived from a geothermal deposit through the building. Geothermal equipment includes the circulation system, including the pumps and pipes which circulate the hot water through the building. * * * Example (4). Corporation Y acquires a commercial vegetable dehydration system in 1981. The system operates by placing fresh vegetables on a conveyor belt and moving them through a dryer. The conveyor belt is powered by electricity. The dryer uses solely energy derived from a geothermal deposit. The dryer is geothermal equipment * * *. [Sec. 1.48-9(c)(10)(vi), Income Tax Regs.; emphasis added.]
These *353 examples illustrate that even though a structure may utilize geothermal energy in a general sense like the office building in Example (1), the entire structure is not necessarily entitled to an ETC. The regulations require that we examine a facility to determine which assets within that facility actually distribute geothermal energy throughout the facility or use geothermal energy in the operation of the equipment. OTM's compost wharf utilizes geothermal energy to maintain the proper temperature in the structure. Petitioner argues that OTM is entitled to an ETC for the entire compost wharf because it uses geothermal energy. We disagree. In the compost wharf, only the system which actually delivers the heat from geothermal sources, for example the pipes that carry the heated water, is eligible for the ETC. As in Example (1), supra, the entire structure is not entitled to the ETC. This reasoning is also applicable to the pasteurization unit structure. While the entire pasteurization unit utilizes geothermal energy to maintain comfortable conditions,only the delivery system for the heated water is eligible for an ETC as equipment that uses geothermal energy *354 within the meaning of the statute and regulations. The pasteurization tunnels utilize geothermal energy to raise the temperature of the compost in the pasteurization process. We hold that the pasteurization tunnels are more like the dryer unit in Example (4), supra, and we therefore hold that the tunnel units are equipment which uses geothermal energy. Using the above analysis, OTM is entitled to an ETC for some of its assets in the grow unit. The structure which houses the grow unit is not entitled to an ETC because it is not equipment that uses geothermal energy. By inference section 1.48-9(c)(10)(vi), Example (1), Income Tax Regs., excludes a housing structure from eligibility for an ETC. The grow rooms, on the other hand, utilize geothermal energy distributed by each room's HVAC system. The grow rooms are air-tight structures that require the heated air to provide the proper environment for mushrooms. We hold that the grow rooms are equipment that uses energy from a geothermal deposit. Sec. 1.48-9(c)(10)(vi), Example (4), Income Tax Regs. As to the grow racks, petitioner did not show that the system designed to distribute geothermal energy *355 was ever used, and we therefore hold that it cannot be equipment which uses geothermal energy. Geothermal equipment also includes "equipment that transports geothermal steam or hot water from a geothermal deposit to the site of ultimate use * * * [and] * * * includes components of a heating system, such as pipes and ductwork that distribute within a building the energy derived from the geothermal deposit." Sec. 1.48-9(c)(10)(iii), Income Tax Regs. Petitioner argues that its HVAC systems, which helps to distribute the geothermally heated water, is equipment which distributes geothermal energy. We agree. The HVAC system was the vehicle OTM used to distribute the geothermally heated water throughout the facility. While some of the components of the HVAC, such as the fan, may have used electricity, that does not put the HVAC systems outside the definition of equipment which distributes geothermal energy. Section 1.48-9(c)(10), Income Tax Regs., provides that an asset need not use solely geothermal energy to qualify as equipment that uses geothermal energy. The regulations allow up to 25 percent of the energy sources to come from nonalternative energy sources. However, equipment *356 will be considered as equipment that uses geothermal energy "only to the extent of its basis or cost allocable to its use of energy from a geothermal deposit". Sec. 1.48-9(c)(10)(iv), Income Tax Regs. In the instant case, OTM's facility derives 81.9 percent of its energy usage from geothermal sources; thus, its assets can qualify as geothermal equipment even though they also use electricity and propane. However, because only that portion of the cost of the equipment which relates to geothermal energy use can be eligible for an ETC, and because petitioner has not shown the geothermal energy usage of individual assets, OTM is only entitled to an ETC on 81.9 percent of the cost of its assets that otherwise qualify for the ETC. Petitioner has not shown that any of the rest of its assets are eligible for the ETC. Because petitioner has the burden of showing that the Commissioner's determinations are erroneous, we sustain the determinations with respect to the eligibility for an ETC on the remainder of OTM's property. Rule 142(a). Respondent argues that even if we find that the assets are geothermal equipment and that they use geothermal energy, the assets still do not qualify for *357 an ETC because petitioner has not established that each asset's use of geothermal energy exceeds 75 percent of its total energy use. Respondent interprets section 1.48-9(c)(10)(iv), Income Tax Regs., as requiring that a taxpayer who seeks to qualify certain dual use property (i.e., property that uses both geothermal energy and electricity) to show, through separate energy studies, the percentage of geothermal energy used for each asset. Section 1.48-9(c)(10)(iv), Income Tax Regs., provides: (iv) Geothermal equipment includes equipment that uses energy derived both from a geothermal deposit and from sources other than a geothermal deposit (dual use equipment). Such equipment, however, is geothermal equipment (A) only if its use of energy from sources other than a geothermal deposit does not exceed 25 percent of its total energy input in an annual measuring period and (B) only to the extent of its basis or cost allocable to its use of energy from a geothermal deposit during an annual measuring period. * * * The allocation of energy use required for purposes of paragraph (c)(10)(iv)(A) and (B) of this section may be made by comparing, on a Btu basis, energy input to dual use equipment *358 from the geothermal deposit with energy input from other sources. * * *
Nowhere do we find the regulations requiring that a separate energy use study be made as to each asset. The purpose of the ETC is to encourage the use of alternative sources of energy and thereby to reduce the country's dependence on traditional forms of energy. S. Rept. 95-529 (1977), 1978-3 C.B. (Vol. 2) 199, 205. In the instant case, OTM derives 81.9 percent of its energy from geothermal energy. OTM was built at the Vale, Oregon, site because geothermal energy was available. Thus, while OTM uses propane and electricity in its facility, it has met the requirements of the regulations set out above, and it satisfies the purposes of the statute. Therefore, respondent's arguments are without merit. III. Placed in Service
Having determined that certain of OTM's assets are eligible for an ITC and/or an ETC, we must now determine in what year the assets were placed in service. Although we have held that certain assets of OTM are entitled to a credit, section 38 allows a credit (including an ITC and an ETC) on section 38 property only in the year that such property was placed in *359 service. Section 1.46-3(d), Income Tax Regs., provides: (d) Placed in service. (1) For purposes of the credit allowed by section 38, property shall be considered placed in service in the earlier of the following taxable years: (i) The taxable year in which, under the taxpayer's depreciation practice, the period for depreciation with respect to such property begins; or (ii) The taxable year in which the property is placed in a condition or state of readiness and availability for a specifically assigned function * * *
Thus, in order for an asset to be placed in service in a given year, it need not actually be used, but must only be in a state of readiness for a specifically assigned function. Piggly Wiggly Southern, Inc. v. Commissioner, 84 T.C. 739, 746 (1985), affd. 803 F.2d 1572 (11th Cir. 1986). To decide the placed in service issue, we must go through each of the facility's assets and apply the above test to each of them. Respondent agrees that the structures surrounding the pasteurization unit and the grow unit were placed in service in 1984. Therefore, we must determine the year in which the compost wharf, the pasteurization *360 tunnels, and the HVAC's used in the pasteurization unit, as well as the grow rooms, grow racks, and the HVAC systems were placed in service. At trial, petitioner and respondent offered conflicting testimony as to when the compost wharf was actually completed and available for use. The burden of establishing the year an asset was placed in service is on petitioner. Rule 142(a). We hold that petitioner has not met his burden of showing that the compost wharf was placed in service in 1984. The compost wharf was not used until 1985, and the evidence as to whether it was even completed before 1985 is conflicting. Petitioner introduced evidence that the compost wharf was available to be used by the end of 1984, but one of OTM's employees testified that the compost wharf was not completed until 1985. Thus, although an asset need not actually be used, it must only be ready for use in a given year, we hold that petitioner has not met his burden of showing that the compost wharf was in a state of readiness before 1985. Petitioner argues that the pasteurization unit and all of the assets used in it were placed in service in 1984. The pasteurization unit was not used in 1984. Instead, *361 pasteurized compost was brought from Treasure Valley Mushrooms for use at the OTM site in 1984. Despite this, the Commissioner allowed 33 percent of the pasteurization tunnels and the HVAC systems used in the pasteurization unit in 1984, and admitted that the structure surrounding the pasteurization unit was placed into service in 1984. Petitioner introduced evidence that the entire pasteurization unit, including all of the tunnels and the HVAC, were in a state of readiness in 1984. Respondent introduced no evidence to contradict this, and offered no indication as to why only 33 percent, as opposed to 100 percent or nothing, was allowed. Therefore, we hold that petitioner has established that the pasteurization unit, including the three pasteurization tunnels and the HVAC's, were placed in a state of readiness, and thus placed in service in 1984. OTM contends that the entire grow unit was placed in service in 1984. Only two of the grow rooms were actually used in 1984. The Commissioner, therefore, determined that only 5 percent of the grow rooms, grow racks, and HVAC systems were placed in service in 1984. There is conflicting evidence as to the availability for use of the *362 other 38 grow rooms including their grow racks and HVAC's in 1984. Petitioner testified that all of the grow rooms were available for use in 1984. However, an employee of OTM, who is familiar with the initial operations of the facility testified that no more than a few of the grow rooms and their HVAC's were completed and available for use in 1984. In light of this conflicting testimony, we find that petitioner has not met his burden in establishing that more than 5 percent of the grow rooms, grow racks, and grow unit HVAC's were placed in service in 1984. Thus, while OTM is entitled to an ITC for the entire grow unit, as to the grow rooms, grow racks, and HVAC's, it may take only 5 percent of the credit in 1984 and must take the remaining 95 percent in 1985. IV. Legal and Accounting Expenses
OTM deducted legal and accounting expenses as ordinary and necessary expenses of an active trade or business in 1984. Respondent disallowed the deduction and determined that the expenses were start-up expenses and should be amortized over a 60-month period pursuant to sections 195 and 709. Ordinary and necessary expenses of an active trade or business are deductible in the year *363 in which the expense is incurred. Sec. 162. Start-up expenditures are generally not deductible, but the taxpayer may elect to amortize those expenses over a 60-month period. Sec. 195(a) and (b). Start-up expenditures are expenses which are incurred by the taxpayer after a decision to acquire or establish a particular business and prior to its actual operation, and they would generally be deductible if they were incurred after the commencement of the particular operation. S. Rept. 96-1036 (1980), 1980-2 C.B. 723. In the instant case, OTM began an active trade or business on May 1, 1984. The legal and accounting fees at issue were incurred after the date OTM began active operation of its mushroom facility. Thus, the expenditures are not "start-up expenditures" within the meaning of section 195(a) and (b). The tax treatment to be accorded the expenditures at issue therefore involves the interaction of section 162, which allows a deduction for "all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business," and section 263, which generally precludes a deduction for expenditures capital in nature. The application *364 of section 263 takes precedence over section 162. Secs. 161, 261; Commissioner v. Idaho Power Co., 418 U.S. 1, 17 (1974). The Supreme Court stated in Commissioner v. Idaho Power Co., supra at 13, that "when wages are paid in connection with the construction or acquisition of a capital asset, they must be capitalized and are then entitled to be amortized over the life of the capital asset so acquired." In the instant case, some of the legal and accounting expenses were incurred after OTM began the active conduct of its trade or business and would, therefore, be deductible in 1984. However, some of the expenses at issue were incurred in the construction of OTM's facility. Those expenses must be added to the cost of the facility and amortized over the life of OTM's mushroom production plant. Petitioner has not shown which of the accounting and legal expenses are attributable to the construction of the facility and which of the expenses are attributable to the conduct of the business. Hence, petitioner has not met his burden in establishing that the legal and accounting expenses are currently deductible, and thus the expenses must be *365 included in the cost of the mushroom facility and amortized over the life of that facility. Commissioner v. Idaho Power Co., supra.
V. Summary
In summary, as to the assets in dispute, we hold that OTM is entitled to an ITC in 1984 for the pasteurization unit, its three tunnels and HVAC's, the structure surrounding the grow unit, and 5 percent of the grow rooms, grow racks, and grow room HVAC's. OTM is entitled to an ITC in 1985 for the compost wharf and 95 percent of the assets within the grow unit structure. For the assets at issue with respect to the ETC, we hold that OTM is entitled to an ETC on the grow rooms and their HVAC's, the pasteurization tunnels and the unit's HVAC's, and the HVAC system of the compost wharf. We hold that OTM is not entitled to deduct the legal and accounting expenses for 1984, but must add those expenses to the cost of its facility and amortize the expenses over the life of the facility. To reflect the foregoing, Decision will be entered under Rule 155.